**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George LINDEMANN, Jr.,
Defendant–Appellant.**

No. 96–1188.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1996.

Decided June 4, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied July 1, 1996.

1234

Barry Rand Elden, Chief of Appeals, R. Christopher Cook (argued), Office of U.S. Atty., Crim. Appellate Div., Chicago, IL, for U.S.

Dan K. Webb (argued), Thomas J. Frederick, Todd J. Ehlman, Bruce L. Bower, Winston & Strawn, Chicago, IL, Jay Goldberg, New York City, for George Lindemann, Jr.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

"Charisma," a show horse, died in its stall on the night of December 15, 1990. The insurance company that had issued a policy on Charisma's life concluded that the death was the result of natural causes and paid the $250,000 value of the policy. Subsequently, the Federal Bureau of Investigation uncovered an alleged conspiracy between Tommy Burns and Barney Ward to kill horses for pay, allowing the horses' owners to collect insurance proceeds. Burns gave the FBI information indicating that George Lindemann, Jr. ("Lindemann"), a partial owner of Charisma, had arranged the horse's death in order to gain the proceeds of its life insurance policy. Lindemann was tried and convicted of three counts of wire fraud in violation of 18 U.S.C. § 1343. He appeals that conviction and we affirm.

## I.

The following is a synopsis of Burns' testimony at trial. Ward[1] had arranged for Burns to kill fourteen horses for pay prior to Charisma's death. On December 13, 1990, Ward called Burns in Chicago and told him that he could make a lot of money by coming to New York to kill a horse for a man Ward identified as "Lindemann." Burns then called Ward's travel agent in New York to book a flight from Chicago to White Plains, New York. Burns arrived in White Plains at 10:18 a.m. on December 15, 1990, and made his way by car to Ward's residence in Brewster, New York—"Castle Hill." The trip took him longer than expected because of icy road conditions. Upon his arrival, Ward told him to call "Cellular Farms," the horse farm of the Lindemann family, and to speak to Marion Hulick, Lindemann's horse trainer and a co-defendant in this action. Two sequential calls were then made by Burns to Hulick at Cellular Farms.

Hulick told Burns that "they had a horse which needed to be killed at their farm." One of Ward's employees drove Burns to Cellular Farms at around 4:00 p.m. where he was taken directly to Hulick's apartment. In the apartment, Burns met Gerald Shepard, an acquaintance who was inquiring about a position at Cellular Farms. Outside of Shepard's hearing, Hulick told Burns that the killing had to be completed that day because "George" wanted it done while he was in Asia and because Charisma was scheduled to travel to Florida the next day. Hulick told Burns that the amount of the insurance policy was $250,000 and Burns demanded ten percent of the proceeds in exchange for the

---

1. Ward was a co-defendant in the original indictment, but his trial was severed from the trial of Lindemann and Hulick.

killing. Hulick responded that "George" would pay whatever it took.

Burns, Hulick and Shepard then drove to a remote area of the farm so that Hulick could point out a back road by which Burns could enter the premises that night. The three then went to the stable area. To indicate which horse was to be killed, Hulick entered the stall of only one horse, whose name plate read "Charisma." Prior to Burns' departure, Hulick assured him that she would see to it that the staff was out that night and that she would lock up the dogs so that his presence would not be detected. Burns then checked into a nearby hotel and purchased electrical cords and other equipment. At about 10:00 p.m. that night, he entered Cellular Farms by way of the back road and electrocuted Charisma in its stall.

Burns' testimony was corroborated through the following testimony and evidence. A colleague of Burns, Harlow Arlie, testified that prior to December 15, 1990, Burns told him that he had arranged a profitable horse killing for "a man in New York who owned a phone corporation." Lindemann's father, George Lindemann, Sr., is a successful businessman in the cellular telephone industry, and Lindemann owns 20 percent of his father's corporation. Weather records confirmed that there were ice storms in the area around Cellular Farms on December 15, 1990. Phone records confirmed that two calls were made from Castle Hill to Cellular Farms at the time identified by Burns. Two of Lindemann's employees confirmed Burns' detailed description of the Cellular Farms premises, including the specifics of a statue in the courtyard and a description of the brass poles containing electrical outlets in each of the horses' stalls. Shepard testified that when Burns arrived at Cellular Farms, Burns and Hulick had a conversation out of his hearing. He also testified that Hulick then drove him and Burns to a remote area of the farm and told Burns, "This is a seldom used road. You can park here and come back." Shepard further confirmed that on the tour of the stables, Hulick entered the stall of only one horse—Charisma. Records confirmed that Lindemann was in Asia from November 23, 1990, to December 22, 1990, and that Charisma was scheduled to travel to Florida on December 16, 1990. Colleen Reed, an employee at Cellular Farms, testified that she was taken out to dinner by Hulick on the night of December 15, 1990. She testified that this was odd because it broke a strictly enforced Cellular Farms rule requiring someone to remain on the premises at all times. Reed testified that when she pointed out to Hulick that no one would be left to monitor the stables, Hulick brushed this fact aside. Reed then found Charisma dead in its stall the morning of December 16, 1990 and observed blood in its nostrils and manure. Finally, it was generally known at Cellular Farms that both Lyman Whitehead and Molly Ash had ridden Charisma in competitions. However, after Lindemann filed the insurance claim for Charisma's death, he specifically told Reed and another employee to lie to the insurance investigators by telling them that Lindemann and his sister were the only people who had ridden Charisma. Lindemann then told the investigators the same thing.

## II.

Lindemann argues that his conviction should be reversed for four reasons. First, he claims that the evidence was insufficient to establish that it was he who ordered Charisma's killing. Second, he argues that even if it was sufficiently established that he ordered the killing, the evidence was still insufficient to prove that the use of interstate wires in furtherance of the scheme to defraud was reasonably foreseeable to him. Third, he argues that the government improperly bolstered Burns' credibility. Finally, he argues that the government engaged in improper conduct during closing argument, depriving him of his right to a fair trial. We address each argument in turn.

## A.

The government's case against Lindemann was as follows: (1) Lindemann defrauded his insurance carrier by ordering Hulick to have Charisma killed; (2) Hulick carried out this order by bringing in Ward to aid in hiring a killer; (3) Ward brought in Burns; and (4) Burns admitted that he did the killing.

Burns' testimony regarding his conversations with Ward, his meeting with Hulick at Cellular Farms, and his electrocution of Charisma was corroborated by other testimony and evidence. Furthermore, Lindemann stipulated to Burns' long relationship with Ward regarding the killing of numerous horses for pay. Thus the evidence strongly indicated that a conspiracy to kill Charisma existed, and that it contained the following members: (1) Burns, who did the killing; (2) Ward, who set up the contact between Cellular Farms and Burns; (3) Hulick, who pointed out to Burns the method of entrance to Cellular Farms and which of the horses was Charisma; and (4) some unknown conspiracy member, who ordered the killing and planned to pay Burns for doing it. Lindemann's contention is that the government presented insufficient evidence to prove that he was that unknown member.

■ Identification of the defendant as the person who committed the crime is certainly an essential element of any offense. *United States v. Alexander*, 48 F.3d 1477, 1490 (9th Cir.1995), certiorari denied, — U.S. —, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995). However, in making a challenge to the sufficiency of the evidence, one bears a "heavy burden." *United States v. James*, 923 F.2d 1261, 1267 (7th Cir.1991). This Court will reverse a conviction for insufficient evidence only if, after reviewing the evidence in a light most favorable to the government, it is determined that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United*

*States v. Brandon*, 50 F.3d 464, 467 (7th Cir.1995).

■ The evidence identifying Lindemann as the unknown member rested specifically on the following testimony of Burns: (1) Ward told Burns that he could make a lot of money coming to New York to kill a horse for a man named "Lindemann"; (2) Hulick told Burns that "George" wanted the killing done while he was in Asia; and (3) Hulick told Burns that "George" would pay whatever it took. Lindemann asserts that these statements were improperly admitted into evidence. If he is wrong, these statements clearly constitute sufficient evidence for the jury to conclude that it was indeed Lindemann who ordered the killing. Unfortunately for Lindemann, because he waived this issue by failing to object when the statements were admitted in the district court,[2] we must review the decision to admit the statements for plain error only. *United States v. Olano*, 507 U.S. 725, 732–734, 113 S.Ct. 1770, 1776–1778, 123 L.Ed.2d 508 (1993). Under this standard, Lindemann must prove that there was an error, that it was plain, and that it affected his substantial rights and the fairness, integrity or public reputation of the judicial proceedings as a whole. *United States v. Penny*, 60 F.3d 1257, 1264 (7th Cir.1995), certiorari denied, — U.S. —, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996).

■ We pause initially to address Lindemann's contention that the statements were inadmissible because they did not satisfy the personal knowledge requirement of Fed.

**2.** Prior to the trial, the government filed a written proffer and motion in limine requesting that the statements be admitted pursuant to Fed. R.Evid. 801(d)(2)(E). The district court then held a hearing on the motion and specifically asked, "[I]s there anything that is in dispute or any question about the government's meeting its obligation to show the conspirators and the co-conspirators as required by *United States v. Santiago*, [582 F.2d 1128 (7th Cir.1978)]?" Counsel for Hulick answered in the negative and counsel for Lindemann remained silent. The court then granted the motion. Furthermore, neither Lindemann nor Hulick objected or requested a limiting instruction when the statements were elicited at trial.

Lindemann concedes that he did not object to the admission of the statements. He argues that

he did not do so because "the statements were admissible to show a conspiracy between certain alleged participants in the fraud scheme." However, he claims that his failure to object does not mean that he abandoned his claim that the statements were *inadmissible* to identify him as a participant in that scheme. Unfortunately, that is exactly what it means. Attempting to draw a distinction between admissibility regarding conspiracy and admissibility regarding identification does not eliminate the most basic tenet of the law of waiver: If one would like to preserve error regarding the admission of evidence, one must make a specific objection to that evidence at the time when it is offered. See, *e.g., United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993).

R.Evid. 602.[3] Lindemann contends that pursuant to Rule 602, the government was required to introduce evidence to prove that Ward and Hulick, as the declarants of the statements, had personal knowledge that it was Lindemann who ordered the killing. However, the Advisory Committee Notes to Rule 801(2)(d)(E) specifically refute this contention:

*No guarantee of trustworthiness is required in the case of an admission.* The freedom which admissions have enjoyed ... from the restrictive influence of the opinion rule *and the rule requiring first-hand knowledge,* when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility. (emphasis added).

Furthermore, every court that has addressed the issue has held that coconspirator statements are not subject to the requirements of Rule 602. *United States v. Saccoccia,* 58 F.3d 754, 782 (1st Cir.1995) (holding that the personal knowledge requirement of Rule 602 does not apply to coconspirator statements admissible under Rule 801(d)(2)(E)), certiorari denied, —— U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); *United States v. Goins,* 11 F.3d 441, 443–444 (4th Cir.1993) (same), certiorari denied, —— U.S. ——, 114 S.Ct. 2107, 128 L.Ed.2d 668 (1994); *United States v. McLernon,* 746 F.2d 1098, 1106 (6th Cir. 1984) (same); *United States v. Ammar,* 714 F.2d 238, 254 (3d Cir.1983) (same), certiorari denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *cf. Brookover v. Mary Hitchcock Memorial Hosp.,* 893 F.2d 411, 415–418 (1st Cir.1990) (personal knowledge requirement does not apply to an admission under Fed.R.Evid. 801(d)(2)(D)). Thus, Rule 602 did not require the government to present specific evidence of Ward's and Hulick's personal knowledge.

■■■■ With that aside, we turn now to whether it was plain error to admit the statements pursuant to Fed.R.Evid. 801(d)(2)(E). The basis for excluding hearsay evidence is the notion that statements made while not under oath and while not subject to cross-examination are inherently unreliable. However, the Rules except admissions from the hearsay definition because it is disingenuous for a party to claim that a statement that he himself made is unreliable. This justification loses force in conspiracy situations, however, where the declarant is not the party against whom the statement is offered. But two concerns unrelated to reliability favor admission in conspiracy situations. First is the basic agency principle that acts by one conspirator are chargeable against all those who conspired. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Thus one conspirator's statements are admissible as evidence against the others. The second concern is necessity:

Conspiracies are secretive; often their aim is to commit destructive crimes (drug dealing, kidnapping, extortion, murder); often they raise social costs and risks more than individual crimes; live testimony by active participants is hard to get. These reasons account for the crime of conspiracy, the leeway given to the government in prosecuting, and the [coconspirator] exception itself. Mueller and Kirkpatrick, *Federal Evidence* § 425 (2d ed.1994).

Because of these concerns, the Federal Rules of Evidence treat coconspirator statements as non-hearsay, despite the fact that the declarant is not the party against whom they are offered. Thus a court may admit such statements if it determines that the declarant and the defendant were involved in an existing conspiracy, and that the statement was made during and in furtherance of that conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 175–176, 107 S.Ct. 2775, 2778–2779, 97 L.Ed.2d 144 (1987). The standard to be applied is a preponderance of the evidence. *Id.* Furthermore, in making its determination, the court may consider all non-privileged evidence, Fed.R.Evid. 104(a) ("[The court] is not bound by the rules of evidence except those with respect to privileges."), including the statements themselves. *Id.* at 181, 107 S.Ct. at 2781–2782. However, to ensure an element of reliability in the state-

---

3. Rule 602 states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602.

ments, courts have required that some evidence, independent of the statements, exist to corroborate the conspiracy's existence.[4]

■ Given these principles, Judge Marovich's determination that the statements at issue were made in furtherance of a conspiracy between Lindemann, Hulick, Ward, and Burns, and thus admissible pursuant to Fed. R.Evid. 801(d)(2)(E), was not plain error. The evidence sufficiently demonstrated that Burns killed Charisma and was involved in a conspiracy with others in doing so: Burns admitted to being in the "horse killing business"; he admitted to killing Charisma for pay; Arlie testified that prior to leaving, Burns mentioned being paid to go kill a horse in New York; and Shepard testified that Burns was at Cellular Farms on December 15, 1990. Furthermore, there was sufficient evidence that the conspiracy involved both Hulick and Ward: Burns testified at length to the specific roles of both Hulick and Ward in the conspiracy; phone records confirm telephone calls from Ward's residence to Cellular Farms at the times indicated by Burns; Shepard corroborated that Hulick and Burns had a secretive conversation on December 15, 1990, and that Hulick pointed out to Burns a seldom used back road that he could use "to come back" that night; and Shepard further corroborated that while they were in the stables, Hulick entered Charisma's stall, and no other.

■ Finally, there is evidence that the conspiracy involved Lindemann. Most important, of course, are the statements themselves, which involved Ward and Hulick referring specifically to "George" and "Lindemann" as the unknown conspiracy member.[5] But the evidence does not end there. The government offered evidence corroborating many of the facts contained in the statements. *Bourjaily*, 483 U.S. at 180, 107 S.Ct. at 2781 ("[A] piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence."). One of Hulick's statements was that Burns had to kill Charisma on December 15, 1990, because "George want[ed] it done while he [wa]s in Asia," and because Charisma was scheduled to travel to Florida the next day. The government introduced independent evidence proving that Lindemann was in fact in Asia on December 15, 1990, and that he would return a few days later. It also introduced independent evidence that Charisma was scheduled to travel to Florida on December 16, 1990. Proving that particular elements of the statement did in fact occur satisfies the function of the independent evidence requirement: ensuring an element of reliability in the statement as a whole. *Bourjaily*, 483 U.S. at 179–180, 107 S.Ct. at 2781 ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."); see also *United States v. Blevins*, 960 F.2d 1252, 1256 (4th Cir. 1992) (admitting coconspirator statements detailing defendant's role in a conspiracy where independent evidence established that the defendant was at a specific loca-

---

**4.** Although the Supreme Court expressly declined to decide whether a trial court could rely "solely upon [the declarant's] hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence," *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781, nearly every Circuit Court of Appeals has answered the question in the negative and required some independent evidence to corroborate the conspiracy. See *United States v. Clark*, 18 F.3d 1337, 1340–1341 (6th Cir.1994), certiorari denied, — U.S. —, 115 S.Ct. 152, 130 L.Ed.2d 91 (1994); *United States v. Sepulveda*, 15 F.3d 1161, 1181 (1st Cir.1993), certiorari denied, — U.S. —, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *United States v. Byrom*, 910 F.2d 725, 736 (11th Cir. 1990); *United States v. Garbett*, 867 F.2d 1132, 1134 (8th Cir.1989); *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir.1988); *United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir.1988), certio-

rari denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir.1987), certiorari denied, 494 U.S. 1059, 110 S.Ct. 1532, 108 L.Ed.2d 771 (1990).

**5.** We cannot take seriously Lindemann's argument that the government failed to meet its burden of proving that the "George Lindemann" referred to was not his father, George Lindemann, Sr.: "Even assuming that these were references to 'George Lindemann,' there were at least two George Lindemanns to whom the name could have reasonably referred: George Lindemann, Sr. as well as George Lindemann, Jr." [Def. Br. 24]. Furthermore, Lindemann took no steps to raise this theory of defense below, consistently referring to himself in argument and in stipulations as simply "George Lindemann."

tion at the time the coconspirator had stated); *United States v. Brown*, 940 F.2d 1090, 1093 (7th Cir.1991) (same).

In addition, Arlie testified that prior to leaving for New York, Burns told him that he was going to New York to kill a horse for "a man who owned a phone company." The government offered proof that Lindemann owned 20 percent of his father's large cellular phone corporation. The government also introduced evidence that after Charisma's death, Lindemann intentionally lied, and ordered his employees to lie, to insurance investigators so that the insurance company would not be able to apply one of the policy's exceptions. While these actions did take place after Charisma's death, they aid in making it "more likely than not" that Lindemann was involved in the fraud. See *United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977) ("Even if a conspiracy has terminated, evidence of subsequent acts may be admitted to elucidate the nature of the prior conspiracy.").

█ Given the multiple statements referring to "George Lindemann," the evidence corroborating facts contained in the statements, and Burns' corroborated testimony regarding the rest of the conspiracy, Judge Marovich was entitled to conclude that, more likely than not, Ward and Hulick were involved in a conspiracy with Lindemann to kill Charisma. Judge Marovich was also entitled to conclude that the statements were made in furtherance of that conspiracy. Each statement was made to identify for Burns the party who would pay him for the killing. Such identifications facilitated Burns' decision to kill Charisma and were therefore in furtherance of the conspiracy. See *United States v. Nevils*, 897 F.2d 300, 308 (8th Cir. 1990) (naming of coconspirators held to be in furtherance of conspiracy), certiorari denied, 498 U.S. 844, 111 S.Ct. 125, 112 L.Ed.2d 93 (1990). Thus Judge Marovich's determina-

tion that the statements were admissible pursuant to Fed.R.Evid. 801(d)(2)(E) was not plain error.

### B.

█ Next, Lindemann argues that there was insufficient evidence that he caused the use of interstate wires in furtherance of the conspiracy to defraud the insurance company, and thus insufficient evidence that he violated 18 U.S.C. § 1343. There are two elements to the offense of wire fraud under Section 1343: (1) a scheme to defraud; and (2) the use of a wire communication in furtherance of that scheme. *United States v. Strickland*, 935 F.2d 822, 828 (7th Cir.1991), certiorari denied, 502 U.S. 917, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991). As discussed above, the government introduced sufficient evidence to establish that Lindemann, Hulick, Ward, and Burns were involved in a conspiracy to kill Charisma. It further introduced evidence that the conspiracy members knew that the purpose of the killing was to defraud the insurance company: Burns testified that when he asked Hulick the value of the insurance policy, she stated that it was $250,000 and that Lindemann would pay Burns 10 percent as his share. This evidence was sufficient to establish a scheme to defraud and the first element was met.

█ For the second element, Lindemann must have caused the use of interstate wires in furtherance of the scheme to defraud. However, he need not have made the calls himself: As a member of a conspiracy, he is criminally responsible for wire communications "caused by other [conspiracy] members, whether or not he knew of or agreed to any specific" communication. *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir. 1983).[6] The government introduced evidence that Burns and Ward made interstate calls in furtherance of the conspiracy: Ward's telephone call from New York to Burns in Illi-

---

**6.** The government argues that Lindemann was vicariously liable for the calls of Ward and Burns such that Lindemann's conviction could stand as long as the government proved that the calls were foreseeable to either Ward or Burns. This may have been true if the jury was instructed on vicarious liability. However, the government did not argue this theory to the jury. The jury was specifically instructed that the reasonable foreseeability of the calls was an element of each count that had to be proven with respect to Lindemann. Thus the government is precluded from advancing the vicarious liability theory on appeal. *United States v. Manzella*, 791 F.2d 1263, 1267–1269 (7th Cir.1986).

nois to bring him into the conspiracy; Burns' return of that call the same day; and Burns' call from Illinois to Ward's travel agent in New York to arrange his trip to Cellular Farms to do the killing. Lindemann cannot be held criminally responsible for those calls unless he acted with knowledge that the calls would follow in the ordinary course of business of the scheme, or the calls could have been reasonably foreseen by the defendant. *United States v. Brandon*, 50 F.3d at 467.

■ Viewed in the light most favorable to the government, the evidence indicated that Lindemann ordered Hulick to have Charisma killed while he was in Asia. Whether he had already spoken to Ward on the issue of hiring a killer, or whether Hulick called in Ward herself, it is reasonably foreseeable that Ward would have to make telephone calls to arrange the hiring. Lindemann does not really dispute this. Rather, he argues that the government did not prove that he could have reasonably foreseen that his actions would result in *interstate* calls. Lindemann has confused what must be proven to satisfy the second element. The government must only prove:

(1) either:

  (a) he acted with knowledge that telephone calls would be made in furtherance of the scheme to defraud; or

  (b) it was reasonably foreseeable that telephone calls would be made in furtherance of the scheme to defraud; and

(2) that the calls that were actually made in furtherance of that scheme were of an interstate nature.

It need not prove that the interstate nature of the calls was foreseeable. *United States v. Blackmon*, 839 F.2d 900, 907 (2d Cir.1988) (conviction for violation of wire fraud statute does not require knowledge of the interstate nature of the calls made); *United States v. Bryant*, 766 F.2d 370, 375 (8th Cir.1985) (same), certiorari denied, 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986) This is so because the element of an "interstate nexus" in Section 1343 is included in the statute not because making interstate calls is more "wrong" in a moral sense than making intrastate calls, but because Congress's power over intrastate activities is limited by the Commerce Clause. Whether the defendant knows that his conduct involves an "interstate nexus" adds nothing to the gravity of the offense that he is committing. Thus it has consistently been held that for statutes in which Congress included an "interstate nexus" for the purpose of establishing a basis for its authority, the government must prove that the defendant knew he was involved in the wrongful conduct, but need not prove that the defendant knew the "interstate nexus" of his actions. See *United States v. Feola*, 420 U.S. 671, 685, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975) (conspiracy to assault a federal officer, 18 U.S.C. § 111); *United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir.1994) (use of interstate wires to threaten individuals, 18 U.S.C. § 875(c)); *United States v. Muza*, 788 F.2d 1309, 1311–1312 (8th Cir.1986) (arson on building used in interstate activities, 18 U.S.C. § 844(i)); *United States v. Roglieri*, 700 F.2d 883, 885 (2d Cir.1983) (possession of material stolen from the mail, 18 U.S.C. § 1708); *United States v. LeFaivre*, 507 F.2d 1288, 1298 (4th Cir.1974) (use of interstate facilities in gambling activity, 18 U.S.C. § 1952), certiorari denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *Overton v. United States*, 405 F.2d 168, 169 (5th Cir.1968) (receiving a stolen vehicle in interstate commerce, 18 U.S.C. § 2313).

■ This lack of a *mens rea* requirement with regard to the "interstate nexus" is in no way unfair. Defendants who use interstate wires in schemes to defraud are not involved in conduct that, other than the interstate aspect of their calls, is legitimate in nature. Thus they cannot claim unfair surprise in finding out that they were violating the law. The only surprise they experience is in learning that not only were they violating state law, they were violating federal law as well. *Feola*, 420 U.S. at 685, 95 S.Ct. at 1264 ("The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum.").

Thus we reject Lindemann's claim that there was insufficient evidence that he violat-

ed 18 U.S.C. § 1343. The government proved each of the required elements of the statute: It introduced sufficient evidence for the jury to conclude that Lindemann was involved in a conspiracy to defraud; it introduced sufficient evidence that it was reasonably foreseeable to Lindemann that telephone calls would be made in furtherance of that scheme; and it introduced sufficient evidence that interstate telephone calls were actually made in furtherance of the scheme. Nothing more was required.

### C.

Lindemann next challenges the admission of evidence regarding Burns' cooperation with the government on other cases. During Burns' cross-examination, Lindemann attacked the credibility of his testimony by suggesting that he would not have gotten a plea deal if he hadn't come up with the name of a "big fish" like Lindemann. Naturally, the government wanted to offer evidence to rebut Lindemann's assertion. Specifically, it wanted to explain to the jury that Lindemann's indictment and Burns' cooperation were the result of a much larger investigation involving the killing of 15 horses, including Charisma. Thus the government elicited from Burns the following testimony:

Q: Now, Mr. Burns, when the federal agents came down to Florida after you were arrested for killing a horse, Streetwise, they asked you a lot of questions about your crimes; is that right?

A: Yes, they did.

Q: Were those agents focused on George Lindemann?

A: No, they weren't. They basically focused on Helen Brach.[7]

Q: During the course of your cooperation, Mr. Burns, you cooperated against other wealthy people; isn't that right?

A: Oh yeah.

Q: And you've cooperated, have you not, Mr. Burns, with respect to other famous equestrians?

A: Yes, I have.

\* \* \* \* \* \*

Q: Is George Lindemann a big part of your cooperation or a small part of your cooperation?

A: They never treated him like he was a big part.

Q: In fact, Mr. Burns, you told the government about many, many people that you killed horses for. To your knowledge, how many people did you discuss with the government, roughly?

A: 30.

Q: And how many of those people have pleaded guilty?

A: 90 percent of them.

[Tr. 594–595]. Immediately following this testimony, the court instructed the jury as follows:

This testimony may be considered by you solely for the purpose of understanding the scope of Tom Burns' cooperation with the government. The fact that other subjects in the investigation may have pled guilty must not be considered by you to infer that the defendants are, therefore, guilty of the crimes with which they are charged.

[Tr. 596]. We review the district court's decision to admit this testimony under an abuse of discretion standard. *United States v. Gill*, 58 F.3d 334, 337 (7th Cir.1995).

Lindemann argues that Burns' testimony was inadmissible because it was essentially "bolstering." "Bolstering" is the practice of offering evidence solely for the purpose of enhancing a witness's credibility before that credibility is attacked. Such evidence is inadmissible because it "has the potential for extending the length of trials enormously, ... asks the jury to take the witness's testimony on faith, ... and may ... reduce the care with which jurors listen for inconsistencies and other signs of falsehood or inaccuracy." *United States v. Le-Fevour*, 798 F.2d 977, 983 (7th Cir.1986). Once a witness's credibility has been attacked, however, the non-attacking party is permitted to admit evidence to "rehabilitate" the witness. *United States v. McKinney*,

---

**7.** We address the reference to the Helen Brach investigation below in Part D.

954 F.2d 471, 478 (7th Cir.1992), certiorari denied, 506 U.S. 1023, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992).

■ Lindemann's suggestion that Burns falsely implicated him to obtain a plea deal was certainly an attack on the credibility of Burns' testimony. More specifically, it was an attempt to show that Burns had a bias:

> Bias is the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or *by the witness' self-interest.* *United States v. Abel,* 469 U.S. 45, 53, 105 S.Ct. 465, 469–470, 83 L.Ed.2d 450 (1984) (emphasis added).

Bias is one of the five acceptable methods of attacking the credibility of a witness's testimony: (1) attacking the witness's general character for truthfulness; (2) showing that, prior to trial, the witness has made statements inconsistent with his testimony; (3) showing that the witness is biased; (4) showing that the witness has an impaired capacity to perceive, recall, or relate the event about which he is testifying; and (5) contradicting the substance of the witness's testimony. Wright & Gold, *Federal Practice and Procedure* § 6094 (1990). Thus Lindemann was perfectly entitled to suggest his theory that Burns was lying about Lindemann in order to better the parameters of his plea deal. *Abel,* 469 U.S. at 53, 105 S.Ct. at 469–470. However, the direct consequence of the attack was that the government was entitled to introduce evidence to rehabilitate Burns on the issue. *United States v. McKinney,* 954 F.2d at 478.

■ The Federal Rules of Evidence specifically address the bolstering/rehabilitation aspect of only two of the five attack methods: Character for truthfulness and prior inconsistent statements.[8] The admissibility of evi-

dence regarding a witness's bias, diminished capacity, and contradictions in his testimony is not specifically addressed by the Rules, and thus admissibility is limited only by the relevance standard of Rule 402. Wright & Gold, *Federal Practice and Procedure* § 6092 (1990). Therefore, because the attack at issue was on Burns' bias, and not on his character for truthfulness in general, Lindemann's contention that the limitations of Rule 608 should have applied is incorrect. Moreover, because bias is not a collateral issue, it was permissible for evidence on this issue to be extrinsic in form. *United States v. Brown,* 547 F.2d 438 (8th Cir.1977) (extrinsic evidence admissible to rebut evidence of bias); see also *United States v. Beauchamp,* 986 F.2d 1, 4 (1st Cir.1993); *United States v. Capozzi,* 883 F.2d 608, 615 (8th Cir.1989), certiorari denied, 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990); *United States v. James,* 609 F.2d 36, 46 (2d Cir.1979), certiorari denied, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

■ Here we conclude that the admission of evidence regarding Burns' cooperation in other cases was relevant. The evidence specifically rebutted the allegation that Burns was biased out of self-interest in Lindemann's case: Burns' successful participation in numerous other cases meant that at the time he was negotiating over his plea deal, he had lots of information to use as bargaining chips. That fact was relevant under the standards of Fed.R.Evid. 402 because it made less probable the assertion that Burns was lying in Lindemann's case out of self-interest. See *United States v. Lochmondy,* 890 F.2d 817, 821 (6th Cir.1989); *United States v. Sanchez,* 790 F.2d 1561 (11th Cir. 1986); *United States v. Martinez,* 775 F.2d 31 (2d Cir.1985); *United States v. Fusco,* 748 F.2d 996 (5th Cir.1984). Finally, the district court immediately warned the jury that it

---

8. Following the traditional rule against bolstering, Fed.R.Evid. 608 states that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked...." Furthermore, Rule 608 provides specific limitations on the admissibility of rehabilitation evidence: Once a witness's character for truthfulness has been attacked, evidence is admissible "in the form of opinion or reputation" (608(a)) or non-extrinsic evidence elicited on cross-examination (608(b)). Fed.R.Evid. 801(d)(1)(B) contains the bolstering/rehabilitation rule by defining as nonhearsay only those prior consistent statements that are offered "to rebut an express or implied charge" against a witness of "recent fabrication or improper influence or motive."

was not to infer Lindemann's guilt from the fact that other indicted individuals had pleaded guilty. Thus the evidence was used only to assess Burns' credibility, not as evidence of Lindemann's guilt.

In conclusion, because Lindemann attacked the credibility of Burns' testimony by asserting that Burns had a bias in Lindemann's case, the government was permitted to rebut that assertion by introducing evidence of its own. Furthermore, because that evidence was relevant according to Fed. R.Evid. 402, the district court's decision to admit it was not an abuse of discretion.

### D.

■ Finally, Lindemann contends that the government's improper conduct in closing argument deprived him of his right to a fair trial. We apply a two-part test for assessing such allegations. First, we consider the prosecutor's disputed remarks in isolation to determine whether they are improper. If so, we then consider the remarks in the context of the entire record and assess whether they had the effect of denying the defendant a fair trial. *United States v. Johnson–Dix*, 54 F.3d 1295, 1304 (7th Cir.1995). Lindemann cites numerous prosecution statements as being prejudicial, most of which he did not object to. Only a few of those statements warrant discussion.

■ First, Lindemann argues that the government made improper closing arguments by referring to facts not in evidence. Specifically, the government stated, "George Lindemann and Marion Hulick were not indicted because they are rich [or] because they are well known in the equestrian industry. They were indicted because information came to the government which it was able to corroborate a hundred different ways." Lindemann argues that the government should not have been allowed to make this statement because it did not introduce the "hundred different" pieces of evidence to which it was referring.

Considering the prosecution's statements in isolation, it is not clear that they were

improper. Lindemann had consistently argued that he was indicted only because of his wealth and social stature. The prosecution was entitled to rebut this assertion by telling the jury that the reason for his indictment had nothing to do with his status, but was because of corroborated evidence. Informing the jury that the government obtains corroborated evidence prior to issuing its indictments is hardly a revelation. Referring to specific pieces of evidence that were not admitted at trial would have been improper. See. *United States v. Fearns*, 501 F.2d 486, 489 (7th Cir.1974). However, the "hundred different ways" comment was not a reference to one hundred individual pieces of evidence, it was just hyperbole. The U.S. Attorney could just as easily have chosen to say a "million different ways." However, even if we were to conclude that the statement was somehow improper, Lindemann has not demonstrated that he was denied a fair trial in the context of the entire record.

Lindemann's next challenge arises out of the same suggestion that Lindemann was only indicted because of his stature. To rebut the suggestion, the government introduced evidence that its investigation had been extremely large in nature and that Lindemann was just one of the many individuals indicted. In eliciting testimony to this effect, it was mentioned in the jury's presence that investigators had originally contacted Burns in reference to the investigation of Helen Brach's disappearance.[9] The district court made the following decision regarding the mention of this other investigation:

> I have no problem with ... the defense ... indicating that because of [Lindemann's] special stature he is the prize that the government seeks. But, on the other hand, the government has an opportunity to respond to that, it seems in all fairness, and say that this is a more far-ranging investigation than that involving Mr. Lindemann.
>
> \*   \*   \*   \*   \*   \*
>
> The name Helen Brach is already before the jury. And, therefore, some direct

---

9. Helen Vorhees Brach, widow of one of the Brach candy family and a horse aficionado, dis-

appeared in 1977, resulting in a publicized investigation.

question about who else was involved in this investigation or who was the primary focus [will be permitted]. If the answer to that is Helen Brach, take the answer and move no further in exploring the answer. And at some time when you think it is appropriate, I am going to instruct the jury that there is no suggestion, none, that either George Lindemann or Marion Hulick were in any way involved with the disappearance of Helen Brach, and that this testimony may only be considered by [the jury] solely for the purpose of understanding the scope of Tom Burns' cooperation with the government. [Tr. 527].

During the rest of the trial, Burns mentioned being contacted regarding the Helen Brach case several times. However, he was never questioned any further on the issue, and the jury was instructed just as the judge stated. Given the court's instruction, the jury was not affected by the mention of the Brach investigation. Thus the statements did not deny Lindemann a fair trial.

 Finally, in closing argument, Lindemann's counsel suggested that the government's lack of medical evidence as to Charisma's cause of death supported Lindemann's innocence. In criticizing the alleged lack of evidence, he referred to the government's "power" and "resources," implying that the government could have presented such evidence if it existed. To respond to this suggestion, the prosecution reminded the jury that it was Lindemann, and not the government, who, in opening argument, had promised medical evidence to establish Charisma's cause of death. The prosecution then made the following statement:

This is what they told you the evidence would prove. Again, did they present any evidence that the horse died of a cardiac arrhythmia? Don't their resources at least equal those of Peter Cullen, the one-man band who solved the Helen Brach case.

Mr. Cullen was one of the federal investigators who worked on Lindemann's and the other horse-killing cases. The district court immediately struck the prosecutor's last sentence and instructed the jury as follows:

Ladies and Gentlemen, [the reference to Mr. Cullen was] one of the remarks that I told you to ignore—and I really want to make sure, because it is inappropriate. I don't care, nor should you, who solved the Helen Brach murder. That's not a part of this trial. Whether he is the hero or anybody is the hero is immaterial. It is particularly so since he hasn't even testified in this trial. [Tr. 1757].

Again, given the district court's immediate and proper instruction to the jury that it was to ignore any references to the Brach case, and Mr. Cullen's involvement specifically, Lindemann has not demonstrated that he was denied a fair trial.

## III.

For the foregoing reasons, the decision of the district court is AFFIRMED.