**UNITED STATES of America, Appellee,**

v.

**Antonione SMITH, a/k/a Abdul Mines, a/k/a York, Appellant**

No. 00–3026.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 2000.

Decided Nov. 24, 2000.

Sandra G. Roland, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A. J. Kramer, Federal Public Defender. Neil H. Jaffee and Tony W. Miles, Assistant Federal Public Defenders, entered appearances.

Mary B. McCord, Assistant United States Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, United States Attorney, John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys.

Before: EDWARDS, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

On November 3, 1999, following a three-day trial, a federal jury found appellant Antonione Smith guilty on one count of

unlawful possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (1994). Smith was thereafter sentenced to 51 months in federal prison, where he now resides. On appeal, Smith identifies three alleged evidentiary errors, each of which he argues merit reversal of the judgment below and remand for a new trial. Only one of the alleged errors, however, requires extended treatment here.

Smith challenges the admission of government witness Frank Haera's testimony that government informant Kevin Perry, himself a witness at trial, had provided truthful information to the police in the past. Here, Smith renews his timely objection that the testimony was irrelevant under Federal Rule of Evidence 402. He also offers a new argument that was not raised at trial, i.e., that the so-called "bolstering" evidence was inadmissible under Federal Rule of Evidence 608(b). Rule 608(b) prohibits the use of extrinsic evidence "for the purpose of attacking or supporting [a] witness' credibility." FED. R.EVID. 608(b). The Government responds that the prosecution offered the "bolstering" testimony to rebut defense counsel's insinuation on cross-examination that informant Kevin Perry had been biased by his plea agreement. As a result, the Government argues that Rule 608(b) does not apply.

We need not reach the substance of this disagreement. The fact that Perry had testified truthfully in the past was plainly relevant. Because Smith did not raise the more specific Rule 608(b) objection at trial, we must review admission on that front for plain error. This circuit has not yet addressed whether, and to what extent, Rule 608(b) prohibits admission of extrinsic evidence of specific instances of past "truthful" cooperation offered by the government to rebut allegations of an informant's bias; and there is no consensus among the circuits that have addressed the issue. Thus, even were we to find error, it would not be plain.

Smith's two remaining challenges fare no better. Smith argues that the trial court, despite defense counsel's failure to lodge timely objections, should have barred *sua sponte* the prosecution's references to Smith's aliases as well as statements implying that Smith was a violent and dangerous criminal. Allusions to Smith's aliases were not so gratuitous, and implications that Smith was a violent criminal not so transparent, as to merit a finding of plain error on either count. We therefore affirm the judgment of the District Court.

## I. BACKGROUND

### A. The Investigation

The Bureau of Alcohol, Tobacco and Firearms ("ATF") utilizes a special High Intensity Drug Trafficking Area ("HIDTA") task force to investigate narcotics dealing, violent crime, and drug-related homicides in the District of Columbia. In 1996, HIDTA agents began a targeted investigation of the Park Morton housing complex and surrounding area—a known locus of drug-trafficking, violence, and a number of unsolved murders. Trial Transcript at 21–22 (Nov. 2, 1999) [hereinafter Tr.]. The investigation employed observation posts, undercover narcotics purchases, and the arrest and recruitment of confidential informants to aid in locating and arresting other perpetrators. Tr. at 22–25.

In the midst of the ongoing investigation, officers observed Perry selling crack cocaine. Rather than face trial on distribution charges, Perry, who is confined to a wheelchair, entered into a cooperation agreement on February 14, 1997. Pursuant to his agreement, Perry entered a guilty plea to one count of conspiracy to distribute and possess with intent to distribute over 50 grams of crack cocaine. Tr. at 59. In exchange for assistance, information, and truthful testimony, HIDTA agents agreed to dismiss two charges then pending against Perry in Superior

Court. Tr. at 63–64. The Government also agreed to file a substantial assistance motion pursuant to *U.S. Sentencing Guidelines Manual* § 5K1.1 (1997), urging the District Court to waive the mandatory 10–year minimum sentence on the federal distribution charge. Tr. at 63. Though not explicitly part of the agreement, agents also provided Perry with various amounts of money for rent, bills, childcare, transportation, and moving expenses. Tr. at 46–47, 104–07.

### B. The Transaction

According to Perry, Smith—whom he had known for 10 years—repeatedly approached him in the summer of 1997 about purchasing an "AK–47." Tr. at 66–67. Though Smith was not himself a target of the investigation, HIDTA agents instructed Perry to go ahead with the transaction. Tr. at 67. Perry testified that he and Smith agreed on a price of $900 for the rifle, and because Perry claimed to be buying the weapon on behalf of a friend, Smith agreed to give Perry a small finder's fee. Tr. at 67. The actual "deal" took place in Perry's apartment on July 9, 1997. Agent Frank Haera of the HIDTA task force oversaw the sting operation. Tr. at 27–29.

On the evening of July 9, and before Smith was to arrive at Perry's apartment, undercover officer Clarence Brooks exchanged Perry's wheelchair for one equipped with a video camera to record the transaction. Tr. at 114. He also fitted Perry with a radio transmitter and provided him a cell phone and money to purchase the rifle. Tr. 30–31. On his way out, Officer Brooks passed a man entering the apartment whom he recognized as Smith, also known to him as "York." Tr. at 114. Though no officer was present during the transaction, Agent Haera surveyed the events via radio transmitter from a block away. Tr. at 30.

Smith did not have the gun with him when arriving at Perry's apartment. At trial, Perry testified that he and Smith initially discussed how Smith might inconspicuously transport the weapon from down the street to the apartment. Tr. at 70–71. Smith left once and returned without the gun, at which time they again caucused over means of moving the merchandise without attracting attention. Tr. at 71–72. Smith left a second time and eventually returned with Daniel Hamilton, or "Cat Face," who carried a large, torn cardboard box into the apartment. Tr. at 72. Hamilton put down the box, which contained a loaded Norinco SKS rifle, loose ammunition, and a black skull cap. Tr. at 34–36, 116–18. Perry and Smith moved the box under the couch, and Perry gave Smith the money. Smith returned a few dollars to Perry for arranging the deal, before leaving the apartment with Hamilton. Tr. at 74. Officer Brooks then returned to the apartment, retrieved the box and its contents, and exchanged wheelchairs. Tr. 116–17.

### C. Proceedings Below

On November 17, 1998, a federal grand jury indicted both Smith and Hamilton on one count of unlawful transfer and possession of a semi-automatic assault weapon, in violation of 18 U.S.C. § 922(v)(1) (1994). Because Smith already had a previous felony conviction, he was also indicted on one count of unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, *United States v. Smith*, Crim. No. 98–399–01–JR (D.D.C. Nov. 17, 1998), *reprinted in* Appellant's Appendix ("App.") at 10. The District Court dismissed the indictment on the first count as to each defendant, leaving only the second count as to Smith.

The trial involving Smith's prosecution commenced on November 1, 1999. After one day of testimony and argument, the jury returned a guilty verdict. At trial, the Government called four witnesses— Agent Haera, Officer Brooks, Kevin Perry, and Jeffrey Descheemaeker, an ATF fire-

arms specialist to testify about the rifle's capabilities. During direct examination of Perry, the prosecutor played the videotape of the transaction, though the sound was inaudible. Tr. at 85. Thus, Perry's testimony was the only evidence presented regarding the content of his discussions with Smith and Hamilton. The defense rested without calling witnesses.

On February 28, 2000, the trial judge sentenced Smith to 51 months in federal prison, followed by three years' supervised release. *See* Judgment, *Smith,* Crim. No. 98–299–01–JR (D.D.C. Feb. 28, 2000), *reprinted in* App. at 13. Smith now appeals, challenging three alleged evidentiary errors. He seeks reversal of the District Court's judgment and remand for a new trial.

## II. ANALYSIS

### A. The So-called "Bolstering" Evidence

Smith argues that the District Court improperly admitted "bolstering" testimony that Perry, himself a witness at trial, had provided truthful information to the task force in the past. Smith points to the following exchange on re-direct examination between the prosecutor and government witness Agent Haera:

Q: Mr. Miles asked you some questions about Mr. Perry's cooperation and the information he's given you. Do you remember those questions?

A: Yes.

Q: Is it true that Perry had given you information that has led to the capture of other criminals?

Mr. Miles: Objection, Your Honor.

The Court: Sustained.

By Ms. Covell:

Q: As a result of Mr. Perry's cooperation, have you been able to arrest other criminals?

Mr. Miles: Objection.

The Court: Sustained. It's leading.

By Ms. Covell:

Q: What happened—well, let me rephrase this. With the information that Mr. Perry gave you, what did you do?

Mr. Miles: *Objection to relevance.*

The Court: *I'll overrule that objection.*

The Witness: Repeat your question.

Ms. Covell: Sure.

By Ms. Covell:

Q: Mr. Perry gave you certain information about individuals in the Park Morton complex; is that right?

A: That's true.

Q: And what did you do with that information?

A: The information that Mr. Perry gave me personally, I did a lot of different things with it. Some of the information was used to obtain search warrants. Some of the information was used to begin investigations on other people in that area that were committing crimes such as drug dealing and firearms possession. And some of the information was used to inform the attorneys of how he could help us in these investigations by way of testimony in the grand jury and at trials.

Q: In any of those search warrants that were based on information given you by Perry, did you uncover contraband?

A: Yes.

Q: And any of those investigations of other individuals that you started as a result of Mr. Perry's information, did any of those investigations lead to arrest?

A: Yes

Q: And were the arrests of those individuals corroborated by any tangible evidence?

Mr. Miles: *Objection, Your Honor.*

The Court: *Sustained.*

By Ms. Covell:

Q: Agent Haera, based on what you know about the information Mr. Perry gave you, and the search warrants you've gotten and the arrests, do you

believe that the information Mr. Perry gave you is truthful?

Mr. Miles: *Objection, Your Honor.*

The Court: *Sustained.*

Ms. Covell: That's all I have, Your Honor.

Tr. at 52–55 (emphasis added). This exchange came on the heels of a cross-examination, during which defense counsel elicited from Agent Haera information regarding Perry's possible bias, including his plea agreement and money paid Perry by the ATF. Tr. at 42–48. Smith here renews his relevance objection and also raises for the first time the inadmissibility of the testimony under Federal Rule of Evidence 608(b).

■ Because defense counsel lodged an objection on the basis of relevance in a timely fashion, we review admission of the cited testimony for abuse of discretion. *See United States v. Ramsey,* 165 F.3d 980, 983 n. 3 (D.C.Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 223, 145 L.Ed.2d 187 (1999). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401.

■ That Perry has informed and testified truthfully in the past under his plea agreement certainly bears on his response to similar pressures and temptations in the present. Furthermore, Federal Rule of Evidence 404(b), which prohibits the admission of evidence regarding past acts "to prove the character of a person to show action in conformity therewith," would be largely superfluous if the rules on "relevance" were construed to proscribe "propensity" testimony. Similarly, were we to agree with Smith, Rule 608(b)'s prohibition on the use of extrinsic evidence of specific instances of a witness' truthful or untruthful conduct "for the purposes of attacking or supporting the witness' credibility" would itself be redundant. The concerns giving rise to Rules 404(b) and 608(b) are

not relevance concerns. To the contrary, both "propensity" rules and the rule restricting the admission of extrinsic credibility evidence embody specific concerns that, although relevant, evidence of prior acts will either unduly prejudice and overpersuade the jury, *see Old Chief v. United States,* 519 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (quoting *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir.1982)), or waste time by sanctioning countless distinct credibility mini-trials within the trial proper, *see* FED.R.EVID. 405 advisory committee's note; FED.R.EVID. 608(b) advisory committee's note. In short, we reject Smith's claim that the disputed testimony was irrelevant and turn to his 608(b) challenge.

■ It should first be noted that certain of the alleged "bolstering" testimony—concerning whether the information that Perry had given to law enforcement officers in the past had been corroborated and whether Perry had been truthful in past dealings—was objected to on unspecified grounds and the objections were sustained. Nonetheless, Agent Haera was allowed to testify that he had received and used information from Perry to facilitate investigations, uncover contraband, and secure arrests. It is this latter testimony that Smith claims was "bolstering" and erroneously admitted under Rule 608(b). In light of our ruling in this case, we need not address the accuracy of appellant's characterization of the disputed testimony as "bolstering."

Because Smith failed to raise a timely Rule 608(b) objection, we review admission of the testimony for plain error. *See* FED. R.CRIM.P. 52(b); *see also United States v. Spriggs,* 102 F.3d 1245, 1257 (D.C.Cir. 1996). The term "plain" as used in Federal Rule of Criminal Procedure 52(b) "is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "At a minimum, a court of appeals cannot correct an error pursuant

to Rule 52(b) unless the error is clear under current law." *Id.*

As noted above, this circuit has not yet addressed whether, and to what extent, Rule 608(b) prohibits admission of extrinsic evidence of specific instances of past "truthful" cooperation offered by the government to rebut allegations of an informant's bias. Although this fact, alone, is not dispositive of the plain error issue, it is important when we consider that Rule 608(b) itself admits of no simple answer to the question at hand and, in addition, our sister circuits have been unable to agree on the point at which impermissible "bolstering" ends and permissible use of past cooperation to rebut bias begins. *Compare United States v. Taylor,* 900 F.2d 779, 781 (4th Cir.1990) ("[I]t was error for the district court to admit extrinsic evidence that the informer, Phillips, had provided reliable information and testimony that resulted in several convictions, in order to bolster Philips' credibility."), *and United States v. Murray,* 103 F.3d 310, 321–22 (3d Cir.1997) (discussing *Taylor*), *with United States v. Lochmondy,* 890 F.2d 817, 821 (6th Cir.1989) ("Several circuits have held that evidence of cooperation on other matters is admissible to justify a cooperation agreement and to rebut allegations of bias." (citing *United States v. Sanchez,* 790 F.2d 1561 (11th Cir.1986); *United States v. Fusco,* 748 F.2d 996 (5th Cir.1984); *United States v. Martinez,* 775 F.2d 31 (2d Cir.1985))), *and United States v. Penny,* 60 F.3d 1257, 1264 (7th Cir.1995) (quoting *Lochmondy*).

Rule 608(b) states that,

[s]pecific instances of the conduct of a witness, *for the purpose of attacking or supporting the witness' credibility,* other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

FED.R.EVID. 608(b) (emphasis added). As both the plain language of the rule and the cases cited above suggest, the threshold question under Rule 608(b) is: For what purpose has the prosecution offered the extrinsic evidence? If offered solely "in order to bolster [the informant's] credibility," *Taylor,* 900 F.2d at 781, then Rule 608(b) bars admission lest one of the exceptions applies. But, if offered for a different and legitimate reason, such as "to justify a cooperation agreement [or] rebut allegations of bias," *Lochmondy,* 890 F.2d at 821, the evidence falls outside Rule 608(b)'s narrow confines.

Government informants present a uniquely difficult case for courts determining whether the prosecution has offered the so-called "bolstering" evidence for a permissible or an impermissible purpose. Routinely, defense counsel cross-examines government witnesses about an informant's bias—whether it be a plea agreement, a financial arrangement, or both. On re-direct, the prosecution may want to introduce specific instances of fruitful cooperation under the plea agreement to show that the informant has already cooperated substantially with the police, thereby reducing the marginal temptation to lie in the present circumstance. The line between this permissible use and impermissible "bolstering" is indeed a hazy one. In *Fusco,* the Fifth Circuit held extrinsic evidence of past cooperation admissible to rebut implications that the informant had received $45,000 from the DEA solely for his help in that case: "Because the government was trying to convince the jury that [the informant] was not biased, it was not 'bolstering' [the informant] in a prohibited way, and [the informant's] prior cooperation was not 'extrinsic,' as those terms are used in Federal Rule of Evidence 608. Bias, as opposed to general veracity, is not

a collateral issue." 748 F.2d at 998. Likewise, in *United States v. Lindemann*, 85 F.3d 1232 (7th Cir.1996), the Seventh Circuit found admissible similar evidence offered in response to suggestions that the informant "would not have gotten a plea deal if he hadn't come up with the name of a 'big fish' like Lindemann." *Id.* at 1242. The court held that

> [t]he evidence specifically rebutted the allegation that [the informant] was biased out of self-interest in Lindemann's case: Burns' successful participation in numerous other cases meant that at the time he was negotiating over his plea deal, he had lots of information to use as bargaining chips. That fact was relevant under the standards of [Federal Rule of Evidence] 402 because it made less probable the assertion that Burns was lying in Lindemann's case out of self-interest.

*Id.* at 1243.

Because defense counsel in the instant case failed to raise the 608(b) objection below, the prosecution never had an opportunity to explain *why* it offered the alleged "bolstering" evidence. Defense counsel had used its cross-examination of Agent Haera to expose the terms of Perry's plea agreement, Tr. at 45–46, to suggest that Perry need only "accuse" suspects to benefit under that agreement, Tr. 44–45, and to show the tremendous financial incentives on Perry to provide even false information, Tr. at 46–48. Perhaps, as in *Lindemann*, the prosecution offered the testimony to demonstrate the diminished marginal value to Perry of his participation in the instant case; perhaps as in *Fusco*, it was offered to undermine any insinuation that Perry had received funds for his participation in this case alone; or finally, perhaps the prosecution wanted to counter defense counsel's specific insinuation that Perry would benefit merely by *accusing* people. We simply do not know. Given these possibilities, the ambiguity in the case law, and the context of the present

testimony, we cannot say that admission of the evidence constituted plain error.

We conclude by emphasizing that, to satisfy the plain error standard, Smith must show that the alleged error "affect[ed] substantial rights," that is, "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734, 113 S.Ct. 1770 (holding that the "substantial rights" inquiry of Federal Rule of Criminal Procedure 52(b) mirrors Rule 52(a)'s "harmless error" inquiry, except that the burden in the former falls on the defendant to show prejudice). Moreover, " '[t]he plain error exception to the contemporaneous objection requirement should be used sparingly, only for "particularly egregious errors" that "seriously affect the fairness, integrity or public reputation of judicial proceedings." ' " *Spriggs*, 102 F.3d at 1257 (quoting *United States v. Copelin*, 996 F.2d 379, 383 (D.C.Cir.1993)). Here, the minimal damage arguably wrought by the contested testimony stands in stark contrast to the overwhelming weight of evidence against Smith. Furthermore, as noted above, it appears that the most damaging of the alleged "bolstering" testimony was excluded pursuant to objections that were raised by Smith's attorney. There was no plain error.

**B. The Remaining Challenges**

We pause only briefly over Smith's two remaining evidentiary challenges. As with the Rule 608(b) issue, defense counsel failed to raise timely objections at trial. We thus review admission for plain error.

 Smith argues first that the District Court improperly allowed the prosecution to refer to and to elicit answers regarding Smith's aliases. The transcript does not reveal, however, whether the prosecution offered the aliases for arguably irrelevant and prejudicial purposes or primarily as a means of identifying Smith—Perry had apparently known Smith as "York." Tr. at 66. Furthermore, Smith has not shown how the limited allusions prejudiced his defense.

■ Smith's second remaining argument—that the District Court erred by admitting evidence *implying* that Smith had been a target of the Park Morton investigation and *implying* that Smith had threatened Perry with violence—fares no better. Perry himself testified that "[Smith] wasn't the target of the investigation, but, however, he approached me and asked me was I interested in buying an AK–47." Tr. at 67. As to possible implications that Perry had been moved on various occasions to protect him from Smith, the District Court addressed any potential problem on its own initiative by requiring the prosecutor to ask for clarification from its witness:

(Bench conference on the record)

The Court: This is—in NFL language, this is my time out. There's been a lot of sort of hinting around the edges of the danger this guy was in, and my concern, of course, is that the implication of all of it is that this defendant is the one responsible for the danger. Now both sides have—both sides have toyed with this. I can't unscramble this egg. But there haven't been any objections until now, but I don't want this danger thing to be played up.

Ms. Covell: I understand, Your Honor. My view is that Mr. Miles opened the door by asking him about the payments for the move. I was going to ask why and make it clear—I can ask a follow-up question was it because of the defendant. He knows it wasn't because of the defendant.

The Court: That would be very helpful.

Ms. Covell: I can do that.

Mr. Miles: Okay.

(End of bench conference)

By Ms. Covell:

Q. What were the reasons that you moved Kevin Perry?

A. I felt that his life was in danger on several occasions. That's why I moved Mr. Perry.

Q. Were any of those occasions that you moved him a result of any sort of threat or danger that came from the defendant?

Let me rephrase that: You never learned that the defendant had ever threatened Mr. Perry in any way?

A. No.

Tr. at 48–49. Any residual problems lingering after the clarification certainly do not constitute plain error.

### III. CONCLUSION

Because the District Court's alleged evidentiary failings do not rise to the level of plain error, Smith's conviction is

*Affirmed.*