**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Shawntell CURRY, Defendant–
Appellant.**

No. 98–1493.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1999.

Decided Aug. 20, 1999.

Mark R. Filip, Office of the United States Attorney, Criminal Division, Chicago, IL; Lawrence Oliver, II (argued), Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Patrick D. Hughes (argued), Wilmette, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and EASTERBROOK and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

For a brief time, Shawntell Curry and various others made it their business to rob various establishments in Illinois and Wisconsin. Charged and convicted of con-

spiring unlawfully to interfere with commerce through these robberies in violation of 18 U.S.C. § 1951 (and a related gun charge), Curry has appealed. His reasons for urging reversal of his conviction include allegedly erroneous evidentiary rulings, jury instructions, a supposedly suggestive lineup, and the sufficiency of the evidence. Finding no error in any of these respects, we affirm.

## I

On May 13, 1997, a grand jury returned a six-count indictment against Curry for charges arising out of the following robberies: the Bell Federal Bank in Homewood, Illinois on September 16, 1996; the M & I Bank in Oregon, Wisconsin on January 27, 1997; the Budgetel Motel in Matteson, Illinois on February 20, 1997; and the First Savings Bank of Hedgewisch in Lynwood, Illinois on February 21, 1997. The indictment also included Curry's alleged co-conspirators, Allan S. Brown, Charles Curry (the defendant's brother), John Q. Pulley, and LaTonya Wilder. The indictment charged that Curry organized the heists and, as necessary, recruited others to assist him, as follows: Curry robbed Bell Federal on his own; he and Pulley together robbed M & I; Curry, Pulley, and Charles Curry robbed the Budgetel Motel; and Curry, Brown, and Wilder participated in the First Savings robbery.

Brown, Charles Curry, Pulley, and Wilder chose to plead guilty and to cooperate with the government, while Curry opted for a trial. There, his erstwhile colleagues Brown, Charles Curry, and Wilder lived up to their bargain with the prosecutors and testified about the robberies and Curry's leading role in them. A number of other witnesses supported their accounts. Among them was Lettie Williams, the Budgetel desk clerk on duty at the time of the robbery. Williams testified that an individual she identified as Curry approached her wearing a baseball cap with a ski mask rolled up under the cap. Initially, she believed that Curry wanted a room. As she was looking at him straight in the face and handing him a registration card, a gun fell from his sleeve onto the counter. Curry quickly pulled the ski mask down over his face and proceeded to rob the motel. Williams later identified Curry three times: from a police photo spread on the day of the robbery, from a lineup one month later, and in court. Rae Williams–Anderson, Curry's cousin, also testified. She recalled that Curry and Pulley arrived unexpectedly at her apartment, located less than half a block from the M & I Bank, on the morning of January 27, 1997. Based upon the way Curry and Pulley looked when they left, Williams–Anderson identified them as the two robbers depicted in photos taken by the bank's surveillance cameras. The jury convicted Curry of five of the six counts against him—that is, everything except the Bell Federal robbery. The court sentenced him to 295 months in prison.

## II

■ Curry's first argument is a now-futile attempt to take advantage of the Tenth Circuit's now-vacated opinion in *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), under which a panel had held that 18 U.S.C. § 201(c)(2) forbids receipt of testimony by witnesses who stand to gain via immunity from prosecution or lower sentences in exchange for their cooperation. The Tenth Circuit later reversed *Singleton*, see *United States v. Singleton*, 165 F.3d 1297 (10th Cir.1999) (*en banc*), and in *United States v. Condon*, 170 F.3d 687 (7th Cir.1999), issued shortly before oral argument in this case, we joined the six other circuits that have unanimously rejected this contention. See *id.* at 688–89 (collecting cases). *Condon* all but disposes of Curry's argument.

■ Using a slight variant on *Singleton*, Curry also argues that the government's use of testimony offered pursuant to a plea bargain is "so severely infected with the unnatural incentives to fabricate"

that it violates the protections of the Due Process Clause. Although we did not specifically address this argument in *Condon*, it was rejected in the case on which the *Condon* court relied, *United States v. Barrett*, 505 F.2d 1091, 1102–03 (7th Cir.1974). Furthermore, in keeping with the Supreme Court's implicit position that the practice of plea bargaining is consistent with due process, see, *e.g.*, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the courts of appeals have long rejected the notion that the testimony of cooperating witnesses is so likely to be unreliable that due process alone requires its automatic exclusion. See *United States v. Ramsey*, 165 F.3d 980, 988 (D.C.Cir. 1999) (collecting cases, including *Barrett*, *supra*).

### III

■■■ Curry's next thrust is against the district court's decision to admit certain statements into evidence under the co-conspirator exception to the hearsay rule. See Fed.R.Evid. 801(d)(2)(E). Our review of these rulings is for plain error only, as Curry failed to object to them at trial. Rule 801(d)(2)(E) provides that an out-of-court statement made by a co-conspirator is not hearsay if the district court determines, by a preponderance of the evidence, that the declarant and the defendant were involved in an existing conspiracy and that the statement was made during and in furtherance of that conspiracy. See, *e.g.*, *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir.1997).

■■■ Curry points to two specific bits of testimony that he claims were erroneously admitted: first, Charles Curry's description of what Pulley had told him about the M & I heist, and second, Wilder's testimony that Pulley had told her he and Curry "had hit some licks before" (by which, according to Wilder, Pulley meant they had committed some robberies) and it was "easy." Curry does not challenge the district court's determination that he and Pulley were involved in a conspiracy at the

time the statements were made. Instead, he argues that the two statements were merely offhand comments that were not made to further the scheme. As a matter of theory, it is true that "mere idle chatter, narrative declarations, and superfluous casual remarks" are not statements made in furtherance of a conspiracy. *Id.*, citing *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir.1991). But it was up to the district court to characterize the two statements here and to assess whether or not they may have advanced the conspiracy. Taking note of the fact that the "in furtherance" requirement is satisfied by statements made to recruit other conspirators, *Godinez*, 110 F.3d at 454, the district court reasonably concluded that Pulley's statements to Wilder and Charles Curry were admissible "recruiting statements," rather than idle chatter. Pulley bragged to Wilder that he had easily committed robberies in the past, a description surely calculated to draw her into the scheme. Pulley's statements to Charles Curry describing the M & I robbery showed a level of trust in Charles Curry that encouraged the latter to sign on—or at least so the district court could conclude. The court was also entitled to take into account the immediate effect of Pulley's comments on his listeners: after speaking with Pulley, both Charles Curry and Wilder did join in the conspiracy. One week later, Charles Curry served as the getaway driver for the Budgetel robbery; one day later, Wilder was the getaway driver for the First Savings robbery.

### IV

Curry also believes that the court committed prejudicial error when it allowed the jury to learn about Pulley's guilty plea. But, just as in *United States v. Lindemann*, 85 F.3d 1232 (7th Cir.1996), Curry essentially brought this problem on himself. During cross-examination of Wilder, Curry attacked the credibility of her testimony by suggesting that she had falsely implicated him in order to obtain a favor-

able plea agreement. In response, the government was permitted to explain to the jury that Wilder's testimony had also implicated Pulley, and that Pulley had pleaded guilty. As a precautionary measure, the district court instructed the jury that they "may" consider Pulley's plea in evaluating Wilder's credibility and "must consider it within the light of all the evidence in the case."

Under the applicable abuse of discretion standard of review for this kind of evidentiary ruling, see *United States v. Gibson*, 170 F.3d 673, 680 (7th Cir.1999), we once again find no reversible error. In *Lindemann*, the government was allowed to rehabilitate a witness by introducing evidence that the witness had cooperated against other subjects of the same investigation who had later pleaded guilty. The evidence was relevant because the witness's "successful participation in numerous other cases meant that at the time he was negotiating over his plea deal he had lots of information to use as bargaining chips" and thus was less likely to be lying in Lindemann's case out of self-interest *Lindemann*, 85 F.3d at 1243. Curry argues that *Lindemann* is distinguishable because Wilder's knowledge about Pulley's activities was "inextricably intertwined" with her information about Curry. Because she couldn't help but implicate Pulley in her attempt to implicate Curry, the defense argues, she didn't have the "multiple bargaining chips" that characterized the *Lindemann* case.

We find the distinction unpersuasive. To the contrary, it will be common in conspiracy cases that a cooperating witness's testimony will help the government obtain more than one conviction (through guilty pleas or otherwise). That is enough to create the multiple "chips" to which *Lindemann* referred. In addition, Wilder's history of successful cooperation was relevant evidence under the standards of Federal Rule of Evidence 402 because the fact that she had cooperated against Pulley, who then pleaded guilty, made it more probable that she was telling the truth about Curry. Although Curry does not argue that the evidence, although relevant, should be excluded because it is overly prejudicial, see Fed.R.Evid. 403, we note that the district court addressed concerns about prejudice by instructing the jury that they could consider Pulley's guilty plea, along with the other evidence, in evaluating Wilder's credibility. Although it might have been more judicious to give an instruction along the lines of that given in *Lindemann*—that the jury was not to consider Pulley's guilty plea as substantive evidence of Curry's guilt—there was no abuse of discretion in the court's failure to do so.

In any event, even if the district court did abuse its discretion in admitting the challenged evidence, any error was harmless. The evidence against Curry was overwhelming, and there were a host of corroborating witnesses whose testimony would have helped the jury to evaluate Wilder's credibility.

## V

Curry also criticizes the jury instructions defining direct and circumstantial evidence, which he maintains improperly biased the jury against him. Because he failed to object to the instructions at trial, our review is again for plain error. *United States v. Miller*, 159 F.3d 1106, 1110 (7th Cir.1998).

The district court gave the Seventh Circuit Committee Pattern Jury Instruction 3.02, which reads as follows:

> Direct evidence is the testimony of a person who claims to have personal knowledge of the commission of the crime which has been charged, such as an eyewitness. Circumstantial evidence is the proof of a chain of facts and circumstances which tend to show whether the defendant is guilty or not guilty. The law makes no distinction between the weight to be given either direct or circumstantial evidence.

Curry believes that the definition of direct evidence suggested to the jury that "direct evidence can point in only one direction: personal knowledge of the *commission of the crime.*" Second, he maintains that the description of circumstantial evidence "subtly undermines the presumption of innocence by framing the question as between two equal propositions—'whether the defendant is guilty or not guilty'— when in fact, of course, the propositions are entirely unequal before the law because the defendant is presumed innocent."

We disagree. The instruction did not misstate the law or mislead the jury. See *United States v. Menting*, 166 F.3d 923, 927 (7th Cir.1999). Instead, it properly explained the difference between direct and circumstantial evidence, and that the two types of evidence should be given equal weight. It does not limit the use of direct evidence to matters tending to show guilt, nor does the circumstantial evidence portion undermine the presumption of innocence. Nothing in the language implies that Curry is not innocent until proven guilty, and, lest there be any question, the jurors were instructed just prior to receiving the challenged instruction that the defendant was presumed innocent during every phase of the trial, that the government's burden was to prove guilt beyond a reasonable doubt, and that the defendant was not required to prove his innocence or produce any evidence. The jury instructions as a whole conveyed a proper understanding of the government's burden of proof.

## VI

Curry next challenges the district court's refusal to suppress Lettie Williams' identification of him in the police lineup, which he believes was unduly suggestive and created a serious likelihood of misidentification. Curry also seeks exclusion of the in-court identification made by Williams, presumably because it was tainted by the improper lineup. The standard of review for decisions refusing to suppress an identification has been expressed both as *de novo* and as clear error in recent opinions. See *United States v. Newman*, 144 F.3d 531, 535 (7th Cir.1998) (*de novo*); *United States v. Funches*, 84 F.3d 249, 253 (7th Cir.1996) (clear error); *United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir.1997) (clear error). We see no need here to resolve this apparent inconsistency, although the discussion in *United States v. Frederick*, 182 F.3d 496 (7th Cir.1999), could be read to suggest that after *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), certain mixed questions of law and fact in the constitutional area must receive more searching review than the clear error standard affords. Here, it is plain that Curry loses under any conceivable approach.

There is a well-known two-step procedure for evaluating a challenge to identification testimony. First, the defendant must show that the identification procedure employed was unreasonably suggestive. If it was, the identification is still admissible so long as, given the totality of the circumstances, the testimony was reliable despite the suggestive procedure. *Funches*, 84 F.3d at 253. In assessing reliability, the court looks at five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Moore*, 115 F.3d at 1360.

Curry argues that the lineup was suggestive because he was the shortest of the suspects (and, as a result, his numbered chest card hung lower than the others, drawing the witness's eye to him), he was much less bulky, and he had a less round face. An examination of a photograph of the lineup shows six men who

appear to be close in age, of the same race, with similar hair styles and facial hair, and wearing identical baggy clothing. Curry does not have a slighter build or a more distinctly shaped face than the others. He is the shortest by several inches (though his chest card does not hang the lowest), but we have held that a similar difference in height does not render a lineup unreasonably suggestive. See *Funches*, 84 F.3d at 253 (lineup was not unreasonably suggestive, despite the fact that the defendant was 3–5 inches shorter and 20–45 pounds lighter than the other participants). Nor should it: if the suspect cannot be the shortest (or presumably the tallest) in a lineup, witnesses aware of these constraints might focus on the persons falling in the middle. For this reason, the participants in a lineup need only have "descriptive features within a reasonable range of similarity to each other." *Id.* The participants here did, and thus the lineup—and the subsequent in-court identification—was proper.

Even if the lineup was suggestive, Williams's identification of Curry was reliable. Williams testified that she looked Curry straight in the face as he stood across the counter from her. Although she had only a short time to view him before he pulled the ski mask down, she saw him at close range with a presumably high degree of attention, at least at the moment the gun dropped from his sleeve. She identified him on three different occasions, the first only a few hours after the robbery, and each time with great certainty.

## VII

Last, Curry argues that his conviction was not supported by sufficient evidence. This court will reverse a conviction on this ground only if, after reviewing the evidence in the light most favorable to the government, it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Saunders*, 166 F.3d 907, 912 (7th Cir.1999). The account of the evidence with which we began this opinion is enough to show that Curry cannot meet this demanding standard. The government presented more than enough evidence for the jury to conclude that Curry was guilty beyond a reasonable doubt.

We therefore AFFIRM the judgment of the district court.