In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3760

United States of America,

Plaintiff-Appellee,

v.

Randy M. Downs,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:99 CR 10024-001--Michael M. Mihm, Judge.

Argued April 11, 2000--Decided October 12, 2000

Before Manion, Diane P. Wood, and Evans, Circuit
Judges.

Diane P. Wood, Circuit Judge.  This appeal is
before us now principally because of a missing
moustache. No one lost it; it was missing only in
the sense that the defendant, Randy M. Downs, who
had been accused of robbing the Heritage Bank in
Peoria, was the only man in a line-up of five who
lacked a moustache. Finding the key witness's
identification of Downs reliable notwithstanding
his notable difference from the other line-up
participants, the district court denied Downs's
motion to suppress. The jury then convicted him
of bank robbery, in violation of 18 U.S.C. sec.
2113(a), and he was sentenced to 51 months in
prison and three years of supervised release. On
appeal, he argues only that the motion to
suppress was wrongly decided (and that this error
was not harmless). While we agree with Downs that
the line-up was unduly suggestive, we conclude
that the witness identification was reliable
nonetheless. We therefore affirm.

I

On March 31, 1999, a white male wearing
sunglasses and a blue hat resembling those issued
by the LaPrairie Mutual Insurance Company
approached Denise Brown, the walk-up teller at
Heritage Bank. He told Brown to remove all of the
money from the drawer, but then, speaking in a

low voice, he altered his instructions and indicated that he wanted only bundles and no $1 bills. Brown later said that she paid close attention to his mouth and lower face, because she was concerned that the robber might become agitated if she had difficulty understanding him. In the 50-some seconds she had to observe him, she also formed the impression that he was lightly unshaven, between 5'6" and 5'8" tall, about 150 pounds, and between 35 and 45 years old. The other teller on duty, Karen Jones, was serving drive-up customers and thus caught only a glimpse of the robber; her description of him was similar to Brown's.

The next day, someone gave Peoria police officers and FBI agents a tip that a woman named Kim Salzman could help them. Salzman was cooperative. She told the officers that the person in the surveillance video from the bank strongly resembled her brother, Randy Downs. Her statement, along with her account that Downs's gambling problems had led him to break into her printing business and steal a compressor in order to pawn it, increased the suspicions of the investigators. They decided to assemble a photo array and show it to both Brown and Jones. They did so, but neither was able positively to identify Downs as the robber from the pictures. Brown suggested that it would be more helpful to see people wearing hats and sunglasses.

Later that day, the officers interviewed Downs himself, first on a gambling boat and then later in a security office. The next day, they talked to Richard Downs, his father. The elder Mr. Downs told the officers that he had given Randy a hat from LaPrairie Mutual Insurance very similar to the one that appeared on the video. He also volunteered that when he had refused to loan Randy $2,000, Randy had responded "you leave me little choice." After this, the officers searched Randy's apartment, with his consent; they found nothing there.

On April 5, the officers held the line-up that is the focus of this appeal. On that day, they had finally arrested Downs and brought him to the police station. One officer telephoned Jones and asked her to come to the station, and he informed Jones that they had arrested someone. Another officer called Brown and asked her to come, but it is unclear whether or not she was told there had been an arrest. For the line-up, each person was given a LaPrairie Mutual hat and a pair of sunglasses. They entered the room seriatim; each man stepped in, walked around, and said "No, put the money in the envelope, hurry." Downs was the second to walk in. As the exhibits Downs later introduced make crystal clear, the other four all

sported heavy moustaches; only Downs had no facial hair at all. Otherwise (but it is a big "otherwise"), they were similar in body build.

At the line-up, both Brown and Jones identified Downs as the robber. Jones was not very confident in her choice, describing her certainty as a seven out of ten, if ten meant absolutely sure. Brown, in contrast, jumped behind one of the detectives the minute she saw Downs enter the room, and exclaimed "Oh my God, that's him." She was crying and trembling, according to the testimony of another officer. Brown then viewed the last three line-up participants, and at the end reiterated that she was "positive" the robber was Downs, based on "the lower half of his face" and his "stocky upper body."

On July 1, 1999, the district court heard testimony on Downs's motion to suppress both the line-up and any in-court identification the government might want to elicit from Brown or Jones. The court concluded that the line-up was indeed too suggestive. It then decided that the Jones testimony would be so unreliable that both her line-up identification should be suppressed and she should be prevented from offering an in-court identification. With respect to Brown, the oral rulings and written record became somewhat confused. Orally, the court first indicated that the circumstances as a whole made Brown's identification reliable and thus admissible. Then, in response to a question from the prosecutor, the judge said that both women's line-up identifications would be suppressed. Later, however, in a written order the court ruled that Brown could be questioned about her line-up identification (and could give an in-court statement).

Downs believes that the judge's ruling was so unclear that this alone is enough to grant relief for him, but we disagree. First, he never asked the court for clarification during the oral phase of the proceedings, even though it was obvious that matters were becoming garbled. Second, and more important, the court itself had the right to review what had gone on in open court and issue a final written order that clarified its ruling. Had Downs wanted to object to the written order, he could have done so, but he did not.

With Brown's testimony secure, the result of the trial was not surprising. Both Salzman and Richard Downs repeated for the jury what they had said to the police. Andy Downs, Randy's son, testified that he and his father had discussed a bank robbery while driving around Peoria. Andy said that they talked about where to park, how to hide the car in a car wash until the police

completed their immediate sweep of the area, which bank to hit, and how they could use a bomb. The bank they discussed was not Heritage Bank, and Downs did not use a bomb, but those facts came out in the testimony. Andy Downs finally said that he was 90% sure that the person in the surveillance photos was his father and that he recognized the sweatshirt worn by the individual there. Finally, Brown testified and identified Downs for the jury.

II

A ruling on a motion to suppress an identification, like many other matters in a criminal trial, presents the kind of mixed question of constitutional law and fact that the Supreme Court has instructed us to review de novo, but with due deference to findings of historical fact made by the district court. See Ornelas v. United States, 517 U.S. 690 (1996). Compare United States v. Newman, 144 F.3d 531, 535 (7th Cir. 1998); United States v. Swift, 220 F.3d 502, 504 (7th Cir. 2000); United States v. Ledford, 218 F.3d 684, 688 (7th Cir. 2000).

On the merits, we conduct a two-step inquiry when we assess the admissibility of a line-up identification. First, we ask whether the line-up was unduly suggestive. If it was, then we look more closely to see if the totality of the circumstances nevertheless shows that the testimony was reliable. See United States v. Curry, 187 F.3d 762, 768 (7th Cir. 1999). In this case, although the government has made a token effort to argue that the line-up was not unduly suggestive, we agree entirely with the district court that it was. Even a glance at the photographs of the men in the line-up, which appear as exhibits in the record, is enough to see why Downs jumps out from the others because of his lack of facial hair. We therefore turn immediately to the second question, whether Brown's testimony was reliable notwithstanding the problems with the line-up.

The reliability inquiry touches on five factors: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Curry, 187 F.3d at 768. All of these, in one way or another, support the reliability of Brown's identification. She could see the lower half of the robber's face, and this was the basis of her identification. At the time of the crime, she was very close to the robber, and she stated firmly that she was paying strict attention to what she

saw. Although 50 seconds may not sound like much, under conditions of great stress they can pass quite slowly. The physical descriptions Brown had given of the robber were reasonably detailed and close to Brown's actual appearance. Brown's dramatic reaction when Downs walked into the room showed clearly that she was quite certain that Downs was the robber. Finally, five days between the incident and the line-up is not such a long span of time that memory lapses would be a problem.

Last is a point not mentioned in this particular five-factor test, but it gives us the opportunity both to note that these tests are principally useful as a guide to the inquiry at hand and that they are not intended to be straitjackets. Given the way this line-up was conducted, Brown had seen only one man (who had a moustache) before she saw Downs and emphatically identified him. She did not know then that the other three men would also have moustaches (or indeed that they would either resemble Downs or stand apart from him in any other way). This as well as the other evidence convinces us that Brown knew what she was talking about; her identification of Downs at the line-up was sufficiently reliable that the jury was entitled to learn about it, and there was no error in allowing her to identify him at trial.

III

In light of our conclusion that the flaws in the line-up did not require the suppression of Brown's testimony, we need not reach the government's alternative argument that any error in this respect was harmless. The judgment of the district court is Affirmed.