In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2154

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ANDREW TRAEGER,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 697--Milton I. Shadur, Judge.

Argued April 1, 2002--Decided May 8, 2002

Before EASTERBROOK, DIANE P. WOOD, and
EVANS, Circuit Judges.

EVANS, Circuit Judge.  It's not a good
idea to rob banks. It's particularly not
a good idea to rob banks when you have
distinctive physical characteristics--
like being bigger than the average
offensive tackle in the National Football
League. Not to mention wearing your hair
in a ponytail.

Andrew Traeger, whose nickname,
appropriately enough, is "Mountain,"
carries 350 pounds on his 6'5" frame. On
an October afternoon in 1997, Traeger
robbed the LaSalle Bank on Chicago's
Ashland Avenue. A LaSalle teller gave
police a description of the robber. One
week later, Traeger tried to rob the
Great Bank on Chicago's Western Avenue. A
report of that attempt, with a
description similar to the description of
the LaSalle robber, went to the police.
Less than 20 minutes later, alert police
officers saw Traeger, who fit the
description they had, walk past a bank
(the North Community Bank) in a strip
mall on Western Avenue. He was arrested a
few moments later. Subsequently, a two-
count indictment was returned charging
Traeger with the robbery and the attempt.
After the jury heard a compelling case
against him--including eyewitness
identifications from bank tellers--

Traeger was convicted on both counts. Today we resolve his appeal from those convictions.

A startling aspect of this case is that Traeger was not sentenced until more than 2 years after he was convicted. In the interim, he discharged his trial lawyer and went through two more lawyers in a failed effort to establish that his trial lawyer rendered ineffective assistance. When Traeger was finally sentenced, he represented himself, and that is one of the grounds he urges on this appeal--a claim that he was denied his Sixth Amendment right to counsel at sentencing.

Before getting to the issues on this appeal, we want to note that the condition of the transcript in this case is as bad as any to reach this court in recent memory. Its deplorable state prompted the government to insert this heads-up in a footnote at the beginning of its brief:

The record on appeal consists of one volume of pleadings and orders, cited as "R." followed by a document number, and, where appropriate, a page or paragraph number within the document; and, as supplemented, 17 volumes of transcripts. The transcript of the trial is five volumes, but each is separately paginated, and the proceedings are not transcribed in order--for instance, one volume transcribes the parties' opening statements on March 23, 1999, followed by the testimony of a single government witness, followed by the closing arguments given on March 25, 1999. The trial transcripts are also erroneously dated March 1998. The trial was in March 1999. However, each volume has a number handwritten on the lower right corner of the cover page. Citations to the trial transcript are to that number, e.g., "132-1," followed by "Tr." and a page number within that volume. Part of the trial was not transcribed. The transcripts of the first day of testimony conclude with the district court announcing a brief afternoon recess, with testimony to resume at 3:25 p.m., and the government informing the district court that it had two more witnesses to call. 133-1Tr. 98-99. The government informed the court reporter regarding this problem, and twice the court reporter has prepared transcripts of what he believed

was the testimony following the afternoon break on March 23, 1999. Both are in error. The first, number 136-1, is a duplicate of Agent Joseph Stiller's testimony at a pre-trial suppression hearing, 132-2Tr. The second, numbered 137-1, is a duplicate of Agent Stiller's testimony at trial on March 25, 1999, as a defense witness. 133-3Tr.3-18. The government has asked the court reporter to continue looking for his notes for March 23, 1999, following the afternoon break. The other transcripts are of the pre-trial suppression hearing and the post-trial proceedings. They are also cited by the number on the lower right corner of the cover page, followed by "Tr." and a page number. "DA" refers to the appendix to defendant's brief. The government's appendix is cited as "GA." The first citation to materials contained in an appendix is to both the record and the appendix, and thereafter to the appendix only.

And that's not all. Headings in the transcripts--indicating what witness's testimony is reported on a page--arehopelessly screwed up. For instance, we found the testimony of one of the arresting officers (LoPresti) recorded under the heading "Amin--recross" and the testimony of Pauline Anderson recorded under the heading "Goodman--redirect." If there were awards for sloppiness, the court reporter (who, out of charity, we will not name) here would win first prize.

Now on to Traeger's appeal. One of the government's witnesses (Anderson) was a prostitute who spent a week with Traeger in a hotel (the Spa Motel)/1 after the LaSalle robbery and before the attempt to stick up the Great Bank. Traeger paid for all lodging, food, beverages, and services performed by Anderson with a roll of bills he kept under a mattress or in a sock. Anderson told the jury that at the end of the week, while she was with Traeger in a "lounge" having a beer, he asked her to go into the Great Bank and see "how far the tellers were from the front door." She said he told her he wanted this information because he "needed a good bank to invest in." She went. She returned shortly and gave Traeger the requested information.

Anderson and Traeger then left the

lounge, hailed a cab, and took it less than a block to the front door of the Great Bank. Traeger got out, told the cab driver to wait, and entered the bank. Traeger returned in a few minutes, saying it "wasn't a good bank to invest in." The cab then proceeded to the bank in the strip mall on Western Avenue. Traeger got out, returned, and before the cab could leave, it was surrounded by police officers.

So, what happened inside the Great Bank while Anderson and the cab driver waited outside? Well, according to Jade Lee, the bank's branch manager, Traeger (whom she identified soon after he was arrested and returned to the bank for a viewing by tellers) approached her at a teller window, announced a robbery, and said if she gave him all the money she would not be hurt. In a state of disbelief, Lee replied, "I'm sorry?" Traeger then repeated his demand for money, adding that he had a gun and that Lee should not press the alarm. Now panicking, Lee said, "I really can't," and backed away from the counter. When Traeger started to reach under his sweatshirt, telling Lee to "come here," Lee said to the teller at the adjacent window, "Sun Gang, get down," and then Lee dropped to the floor. At that point, Traeger left the bank empty-handed. The offered defense to the attempted robbery charge (in Traeger's lawyer's closing argument--Traeger himself wisely elected not to testify) was that there was no intent to rob; it was just a misunderstanding on Lee's part because her English was a little weak.

The first robbery, of the LaSalle Bank, was more conventional. According to a teller, Lorena Barajas, Traeger (whom she identified in an FBI lineup 2 weeks after his arrest) announced a robbery, told her he had a gun, and said she should stay calm, not press the alarm, and give him the $20s, $50s, and $100s from her drawer. She complied and Traeger left the bank $5,840 richer. The defense to this robbery was misidentification.

There was other evidence pointing to Traeger's guilt (like an incriminating utterance to a police officer regarding the LaSalle Bank robbery), but we think we can safely stop now and consider the arguments Traeger advances in the hope of setting aside his convictions.

Traeger's first claim concerns an alleged Brady violation (Brady v. Maryland, 373 U.S. 83 (1963)) involving Ms. Anderson's testimony, which he argues was "outcome-determinative" on the Great Bank charge. This characterization of Anderson's testimony is a bit of a stretch. Sure, "lack of intent to rob" was the "defense" to the charge, but there was no defense evidence offered to support it, only inferences as urged by Traeger's lawyer during closing argument. Nevertheless, we agree that her testimony was helpful to the government, so we'll look deeper into Traeger's claim.

As we said, there was a bizarre 2-year hiatus between Traeger's conviction and sentencing. A lot can happen over 2 years, and a lot did happen here. For one thing, as we have already noted, Traeger went through a number of lawyers. For another, he testified on behalf of a chap named Terrence McClurge, who was being prosecuted by Stuart Fullerton, one of the AUSAs who prosecuted Traeger's case. The McClurge trial took place 8 months after Traeger was convicted. During his cross-examination in the McClurge case, Fullerton asked Traeger if he knew that Anderson was granted immunity in exchange for her testimony against him during his trial.

When Traeger testified in McClurge's trial, he was being represented in post-trial litigation by attorney Gerald Collins, who was appointed to replace Robert Clarke, the trial lawyer who was discharged at Traeger's request. Collins had filed a motion for a new trial alleging that Clarke rendered ineffective assistance. Four months after the McClurge trial, Collins filed a motion for a new trial based on newly discovered evidence, alleging that the government withheld the fact that Anderson testified under a grant of immunity. In response, the government submitted Fullerton's affidavit and the transcript of Traeger's cross-examination at McClurge's trial. In the affidavit, Fullerton explained that at the time of Traeger's trial, he and co-prosecutor Susan Haling thought Anderson might be reluctant to testify for fear of incriminating herself, and that they were prepared to seek immunity for her if that turned out to be the case. As it was, however, the issue never

came up, and Anderson testified without immunity. Fullerton said his statements at the McClurge trial were based on a faulty recollection of what had happened 8 months earlier.

The district court scheduled an evidentiary hearing for March 31, 2000, on the Anderson immunity issue (and several other issues raised in a motion filed by attorney Collins), but when the day came, Traeger submitted a pro se motion to have Collins dismissed from the case, complaining that he misspelled some names in his motion papers and referred to Pauline Anderson as "Pauline Goodman."/2 The pro se motion asked the district court to treat Collins' motion as "null and void."

Collins was granted leave to withdraw, and Traeger subsequently retained another attorney, Ralph Meczyk, apparently using money he received from his father to pay a retainer. When that money ran out, just a few months later, the district court appointed Meczyk to act as Traeger's counsel. On February 16, 2001, Meczyk filed a motion for a new trial, alleging that Clarke rendered ineffective assistance at trial, but the motion made no reference to the earlier claim that the government withheld evidence that Anderson had been granted immunity. Meczyk's motion was denied without a hearing on March 5, 2001.

The case was back in court on March 23, 2001, and Traeger announced that he wanted Meczyk dismissed because he was dissatisfied with his failure to raise all the issues Traeger thought were important. Meczyk was asked to comment and said that, after reviewing all the material in the case and consulting with Traeger, he raised the issues he believed had potential merit and declined to raise the issues "that I did not feel I could do in good conscience." Traeger himself specifically requested that the district court reset the evidentiary hearing that had been set the year before (on the day he fired Collins), at least for purposes of taking evidence on the immunity issue, but the district court refused to do so. The court ruled that it had been prepared to go forward with an evidentiary hearing, depending on the issues raised in Meczyk's motion, but after reviewing the motion it became clear that no

hearing was needed, and the motion was decided on the papers. At this point, it had been 2 years since the conclusion of the trial, and the district court found that Traeger had more than ample time to raise, through counsel, any issues pertaining to the fairness of his trial. The district court was not willing to delay sentencing any longer and set the sentencing hearing for April 30, 2001, but the court also invited Traeger to file a motion for leave to submit additional issues for review if he so desired:

TRAEGER: If I could just amend--I am just asking to amend Mr. Meczyk's motion with a couple of issues. I could do it within a week. I could have it on your desk within one week. And if it's meritless, then just deny it and let's go with the sentencing, your Honor. But I have got to say I am begging you to listen to this, Judge, you know.

THE COURT: Well, let me do this. I am going to set the machinery in place for purposes of sentencing. If you want to tender something, it has to be in the form of a motion for leave to do something. If you want to do that, you can do that. You know, one of I suppose the inevitable consequences of any lawyer, and that means any individual filing a motion before a court for leave to do something is that the court inevitably reads it, you know. It has its own effect. If you want to do that, then you file something, but it has to be in the form of asking leave to file a renewed motion [for] a new trial. And whatever you file, I will look at it. [T]hat I will promise you, because partly because I am compulsive, but also because of the idea whenever anything is tendered by definition in order to consider it, it has to be read.

Traeger did not seek leave to submit any additional issues in support of his motion for a new trial.

Upon this record we have little trouble concluding that Traeger waived his claim that the government suppressed an "immunity agreement" with Anderson. And in waiving the issue, Traeger may have unwittingly outsmarted himself. His waiver is found in his expressly stated disavowal of the motions filed by his

lawyer (Collins, who actually raised the claim) and by his failure to renew the claim when invited to do so in the portion of the transcript we have just quoted. So we have Traeger insisting that Collins' motion be treated as "null and void" and nothing happening after that to properly resurrect the issue. But even were we to find that there was no waiver, we think the issue--whether or not Anderson received immunity--is one that the court could determine without impaneling a full-blown evidentiary hearing. We think the district judge could accept as reliable a representation by an attorney such as the one Fullerton made in his affidavit. What are the chances that Fullerton, a government attorney, would falsely swear under oath that Anderson was not given immunity for her testimony? Because the matter of the immunity grant would be in a public record somewhere, Fullerton would be risking a lot--disbarment and criminal prosecution for false swearing to mention two--on a petty issue. We think it was not unreasonable for the district judge to assume that he wouldn't do so by filing a false affidavit. But we'll add a final nail to the coffin: Even if Anderson had been given immunity, the failure to disclose that fact to Traeger's trial lawyer would be harmless error beyond a reasonable doubt. In fact, we can't imagine that a good lawyer would want to spend too much time cross-examining Anderson on whether she was being spared criminal prosecution for her role in casing the Great Bank before Traeger went in to rob it. Better she does not have immunity, for it might show she didn't think criminal activity was going to take place.

Traeger's next argument is that he received ineffective assistance of counsel at trial because his attorney, Clarke, was "unreasonably passive," failed to advise the court of a chance encounter between Traeger and a juror, and failed to move for separate trials for the two robberies. When considering a claim of ineffective assistance of counsel, we review the district court's conclusions of law de novo, its factual findings for clear error, and its denial of an evidentiary hearing for an abuse of discretion. See Bruce v. United States, 256 F.3d 592, 597 (7th Cir. 2001).

To establish a claim of ineffective assistance, the defendant must satisfy a two-prong test. First, he must show that counsel's performance was deficient, which means that the attorney's errors were so serious that the defendant was deprived of "counsel" within the meaning of the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's shortcomings, the result of the proceeding would have been different. See id. at 694. This is a difficult test to satisfy because counsel is strongly presumed to have rendered adequate assistance and to have made significant decisions in the exercise of his or her reasonable professional judgment. See id. at 690.

Traeger's first contention is that Clarke was cowed by fear of violating a proffer agreement into "making no effort whatsoever" to elicit favorable evidence that was not inconsistent with the proffer, in which Traeger admitted torobbing the LaSalle Bank. The agreement provided that if Traeger testified contrary to the substance of the proffer or otherwise presented a position inconsistent with it, the government could use the proffer at trial for impeachment (or in rebuttal). Traeger claims that he asked Clarke to call several potential witnesses, whom Clarke failed to call. These potential witnesses included two LaSalle Bank security guards whose descriptions of the robber "varied slightly from each other and from the description given by Barajas." Traeger also wanted Clarke to call a desk clerk from the YMCA who believed that the man depicted in the bank's security photos was someone named Ralph Freeman. Another witness Traeger wanted Clarke to call was Great Bank teller Sun Gang (recall what we said earlier about her in quoting teller Lee), who he believed would testify that there was a large sum of money sitting on her counter when Traeger was in the bank and that he did not take it. This evidence, he says, would show that he did not intend to rob the bank. Traeger argues that, under United States v. Krilich, 159 F.3d 1020 (7th Cir. 1998), the testimony of these witnesses

would not have been inconsistent with the proffer and therefore would not have triggered use of the proffer at trial. In Krilich, we held that evidence is inconsistent with a proffer statement only if it implies that the proffer is false. See id. at 1025-26.

Traeger waived or at least forfeited his arguments concerning these witnesses. In his May 1999 pro se motion, he raised an ineffective assistance of counsel claim based on Clarke's failure to call these potential witnesses. In November 1999 Traeger obtained his second attorney, Collins, who filed a second motion asserting ineffective assistance on the same grounds. Once Traeger was represented by counsel, he was not entitled to have the district court consider his previous pro se motion. See United States v. Johnson, 223 F.3d 665, 668 (7th Cir. 2000) (holding that assertion of the right to counsel constitutes de facto waiver of the right to proceed pro se). Thus, Collins' motion became the only one before the district court. Before the court could rule on it, however, Traeger, as we said, fired Collins and asked the district court to treat Collins' motion as "null and void." The motion that Traeger's third attorney, Meczyk, filed did not specifically refer to the potential witnesses we just mentioned, but alleged that Clarke rendered ineffective assistance by, among other things, "failing to address Mr. Traeger's proffer." Meczyk's motion also asserted that, in order to render effective assistance, Clarke would have "needed to deal with the proffer, either in a motion in limine or at trial." The Meczyk motion does not detail how exactly Clarke should have "addressed" or "dealt with" the proffer, but it does go on to note that Traeger had "alibi witnesses." It's certainly less than clear to us that this statement refers to the bank security guards, teller Sun Gang, or the YMCA desk clerk. Assuming that it does, this statement did not sufficiently notify the district court of the substance of Traeger's arguments concerning these witnesses. Therefore, Traeger at least forfeited these arguments. Forfeiture is the failure to make a timely assertion of a right. See id. at 415. We review forfeited errors for plain error that affects substantial rights. See United States v. Olano, 507

U.S. 725, 732 (1993).

But given Traeger's subsequent actions with regard to Meczyk's motion, it appears that he waived these arguments entirely rather than merely forfeiting them. Waiver is the intentional relinquishment or abandonment of a known right. See United States v. Cooper, 243 F.3d 411, 415-16 (7th Cir. 2001). Here, the district court gave Traeger an opportunity to amend or supplement Meczyk's motion. Traeger chose not to file anything renewing his arguments concerning the potential witnesses. Therefore, he intentionally relinquished these arguments. Because he waived them, we may not review them because in such a situation there is no error to correct. See Cooper, 243 F.3d at 415.

Assuming that Traeger merely forfeited these arguments, however, he cannot establish plain error. The record is silent as to why Clarke decided against calling the bank guards as witnesses. We will not presume deficient performance based on a silent record because we presume counsel made reasonable strategic choices unless the defendant presents evidence rebutting that presumption. See Strickland, 466 U.S. at 689-90. Clarke may have decided not to call the bank guards because the impeachment value of their testimony was low. This decision would have been supported by the fact that the bank guards' descriptions of the robber were generally consistent with each other and with Barajas' description--each guard described the robber as a fair-haired white male in his thirties wearing a baseball cap and a long ponytail; both described him as 6'3" or 6'4", and both had him in the neighborhood of 300 pounds. It's also possible that Clarke worried that calling the guards would backfire if they identified Traeger as the robber when they saw him in court.

Nor can we say that Clarke's decision not to call the YMCA desk clerk was ineffective assistance, especially given that testimony from the clerk that "Freeman" was the robber, implying that Traeger was not, would have triggered introduction of the proffer in rebuttal because that testimony would have been inconsistent with Traeger's admission that he committed the robbery. Likewise,

we cannot say that Clarke's decision not to call Sun Gang amounted to ineffective assistance. Traeger puts forth no evidence that she would have testified that Traeger actually saw the alleged pile of money on her counter. A defendant's speculation about what evidence might have been found is insufficient to demonstrate prejudice--he must show what the evidence would have been and how it would have produced a different result. See United States v. Shetterly, 971 F.2d 67, 75 (7th Cir. 1992).

Traeger also claims ineffective assistance based on Clarke's failure to advise the trial judge of a chance encounter between Traeger and a juror. On the last day of trial, one of the deputy marshals escorting Traeger from lockup to the courtroom walked him past the jury room, which had its door open. At the time, the juror was seated in the jury room and could have seen Traeger, who was in shackles wearing an orange jail jumpsuit. Traeger claims that he told Clarke of this incident, but that Clarke advised him not to mention it to the judge because the issue could be a valid ground for appeal in the event of a guilty verdict. Traeger complains that being seen in prison garb and shackles deprived him of the presumption of innocence. See Estelle v. Williams, 425 U.S. 501, 504 (1976).

Traeger bears the burden of showing affirmatively that he was prejudiced by inadvertent exposure to the juror. See United States v. Jones, 696 F.2d 479, 492 (7th Cir. 1982). The facts of Jones are instructive. There, during the second day of trial, the defendant was being escorted to the courtroom via elevator when he allegedly encountered a juror who was standing outside the elevator. At the time, the defendant was shackled to a defendant in an unrelated case who had received tremendous local publicity. The encounter lasted about 4 seconds. See id. at 492. We held that it was not so prejudicial as to require a mistrial. See id. at 492-93.

Here, the district court expressed doubt that the juror even saw Traeger. Even assuming that the juror saw him, Traeger put forth no affirmative evidence that the encounter had an unfairly prejudicial

effect. Two of our sister circuits have held that the mere fact that a juror had a brief view of a defendant in custody is not sufficient to establish prejudice warranting a new trial. See United States v. Van Chase, 137 F.3d 579, 583 (8th Cir. 1998); United States v. Halliburton, 870 F.2d 557, 561 (9th Cir. 1989). This is a sound proposition, given that a reasonable juror would understand that not all criminal defendants are able to post bail, and therefore that their detention pending verdict does not imply guilt.

Traeger's final asserted ground for ineffective assistance is Clarke's failure to move for separate trials on the two charges. Traeger claims that there was a potential for unfair prejudice because his defenses to the two counts were different. But two or more charges are properly joined for trial if they arise from offenses that are the same or of similar character. See Fed. R. Crim. P. 8(a). Clearly, robbery and attempted robbery are similar in character. Additionally, there would have been no point in severing the charges because evidence of the Great Bank attempted robbery would have been admissible in a trial on the LaSalle Bank robbery charge under Federal Rule of Evidence 404(b) to prove identity. Likewise, evidence of the LaSalle Bank robbery would have been admissible under Rule 404(b) to prove intent in a trial of the Great Bank charge. See United States v. Dijan, 37 F.3d 398, 402 (8th Cir. 1994) (holding that joinder of charges was not prejudicial because evidence for each set of counts was mutually admissible to show the defendant's motive, intent, and pattern of criminal behavior).

Traeger also argues that the district court should have suppressed teller Barajas' identification of him as theperson who robbed the LaSalle Bank. He claims that the lineup at which she identified him was unduly suggestive because Traeger was noticeably "bigger" and "rounder" than the other men in the lineup and because Traeger was the only one wearing an "ankle restraint."

In recent cases we have stated inconsistently the standard of review of a district court's refusal to suppress an

identification, sometimes stating that our review is de novo, sometimes that it is for clear error. We first noted this inconsistency in United States v. Curry, 187 F.3d 762, 768 (7th Cir. 1999) (citing United States v. Newman, 144 F.3d 531, 535 (7th Cir. 1998) (de novo); United States v. Funches, 84 F.3d 249, 253 (7th Cir. 1996) (clear error); United States v. Moore, 115 F.3d 1348, 1360 (7th Cir. 1997) (clear error)). We declined to resolve the inconsistency, holding that the defendant in Curry lost under either standard of review. See Curry, 187 F.3d at 768. Since Curry, we have invoked both the clear error standard and the de novo standard without mentioning the conflict. See United States v. Galati, 230 F.3d 254, 259 (7th Cir. 2000) (clear error); United States v. Downs, 230 F.3d 272, 275 (7th Cir. 2000) (de novo). As in Curry, we need not resolve the conflict here, as Traeger's argument is a loser under either standard.

The lineup occurred 3 weeks after the LaSalle Bank robbery. All six participants wore orange jumpsuits. Initially, they were seated to minimize any height differential, but then each took turns standing up. Barajas identified Traeger as the robber without hesitation, later testifying that she recognized him immediately but that she looked over the men twice to be sure before announcing that he was the robber.

Traeger complains that the lineup was unduly suggestive because he was the largest participant. We engage in a two-part inquiry in determining the admissibility of challenged identification testimony. First, we ask whether the defendant established that the identification procedure was unnecessarily suggestive. If it was, we ask whether, under the totality of the circumstances, the identification was reliable despite the suggestive procedures. See Kubat v. Thieret, 867 F.2d 351, 357 (7th Cir. 1989). In determining the reliability of an identification, we consider five factors: (1) the witness' opportunity to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty that the witness demonstrated at the time of the

confrontation, and (5) the time elapsed between the crime and the confrontation. See Cossel v. Miller, 229 F.3d 649, 655 (7th Cir. 2000) (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

Here, our review of photographs of the lineup indicates that, although Traeger was larger than the other participants, the size differential was not so great as to make the lineup unduly suggestive. Additionally, we note that it would have been difficult to find five other men approximating Traeger in size and physical appearance--outside of the NFL, six and a half footers who tip the scales at 350 pounds are fairly rare. Authorities conducting lineups are required only to make reasonable efforts under the circumstances to conduct a fair and balanced presentation. They are not required to search for identical twins in age, height, weight, or facial features. See United States v. Moore, 115 F.3d 1348, 1361 (7th Cir. 1997). A trip to Hallas Hall to gather a lineup was not required here. The fact that the other lineup participants could not pass for Traeger's twins did not make the lineup unduly suggestive.

Even assuming that the lineup was unduly suggestive, the Cossel/Biggers factors support the accuracy of Barajas' identification. Barajas had ample opportunity to view Traeger at the time of the crime, even though Traeger argues that the encounter lasted only 2 or 3 minutes, and that Barajas had to spend at least some of that time looking away from the robber to remove money from her drawer. Barajas spent that time in close proximity to Traeger, and her attention was likely sharpened by the fact that she was being robbed. The description she gave of the robber on the day of the robbery accurately describes Traeger. She stated he was a white male in his early to midthirties who was 6'3" tall, weighed 300 to 350 pounds, was unshaven, and wore a blond ponytail. Finally, the lineup took place only 3 weeks after the robbery, at a time when the robber's appearance was still fresh in Barajas' memory.

Traeger argues that it was significant that Barajas did not recall seeing tattoos on the robber's hands because Traeger has tattooed hands. Traeger did

not present this argument to the district court at the suppression hearing, so he waived it. Even assuming he properly presented this argument, in the face of the other factors indicating that Barajas' identification was reliable, her failure to notice whether the robber had tattooed hands is insignificant.

Traeger also complains that the lineup was unduly suggestive because he was wearing a visible ankle restraint at the time. The restraint was a plastic tie wrap that authorities used because Traeger was too large for leg cuffs. At the suppression hearing, Barajas was shown a photograph of the lineup and directed to describe what she saw on Traeger's right ankle. She stated that the ankle restraint looked like a strap, that she did not remember seeing it during the lineup, and that, after looking at it in the photograph, she did not know what purpose it served.

Based on our review of photos of the lineup, we note that the restraint was a thin plastic tie that someone not familiar with the inner workings of the criminal justice system would not recognize as a restraint. Indeed, it seems unlikely that Barajas even noticed the strap, given that her attention was focused on Traeger's face, which she demonstrated by telling the FBI agents after she identified Traeger that the robber's face and eyes were the features that she remembered most. Thus, the presence of the ankle strap was not unduly suggestive as to corrupt the reliability of Barajas' identification.

Finally, Traeger argues that he was deprived of his right to counsel at his sentencing hearing. Traeger's brief fails to point out that the reason that he was unrepresented at sentencing was that he fired Meczyk, the last in his long line of attorneys, a month before sentencing. He also fails to point out that before the district court allowed Meczyk to withdraw, Traeger stated that he wanted to proceed pro se and acknowledged the court's earlier admonition that, if he fired Meczyk, the court would not appoint yet another lawyer. Traeger claims that in doing so, however, he did not waive the right to counsel.

A defendant can waive his right to

counsel through conduct as well as words. See United States v. Oreye, 263 F.3d 669, 670 (7th Cir. 2001). Because representation by counsel and self-representation are mutually exclusive entitlements, the assertion of one right constitutes a de facto waiver of the other. See Johnson, 223 F.3d at 668. Here, Traeger acknowledged the district court's warning that it would not appoint another attorney if he fired Meczyk and still chose to go forward to sentencing pro se. This choice was a sufficient waiver of the right to counsel.

Additionally, we held in United States v. Irorere, 228 F.3d 816, 826 (7th Cir. 2000), that a defendant may waive the right to counsel through his own "contumacious conduct." There, we upheld the district court's refusal to appoint counsel for the defendant's sentencing hearing because the defendant had already frustrated four of the court's attempts to provide counsel for him. See id. at 827. The facts of Irorere are strikingly similar to those of Traeger's case. Traeger went through three lawyers, firing them for questionable reasons. In the process, he managed to delay his sentencing for almost 2 years. We review the district court's refusal to appoint counsel for abuse of discretion and will not reverse unless the failure to do so would result in fundamental unfairness impinging on due process rights. See id. Under these circumstances, the district judge did not even come close to abusing his discretion in refusing to appoint a fourth lawyer to represent Traeger.

AFFIRMED.

FOOTNOTES

/1 The Spa Motel is not to be confused with the Waldorf-Astoria: its rate was only $25 a night.

/2 There was a "Goodman" who testified during the trial, but her first name was Rochelle.